ADMINISTRATOR, MOTOR VEHICLE ADMINISTRATION *v.* VOGT, T/A VOGT'S USED CARS AND PARTS ET AL.

[No. 118, September Term, 1972.]

*Decided January 11, 1973.*

*Motion for rehearing filed February 13, 1973; denied February 26, 1973.*

The cause was argued before BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*J. Michael McWilliams, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, N. Barton Benson, Special Assistant Attorney General, Thomas G. Peter, Assistant Attorney General,* and *Randy H. Lee, Assistant Attorney General,* on the brief, for appellant.

*Donald J. Gilmore* and *Charles O. Fisher, Jr.,* with whom was *Charles O. Fisher* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

This appeal is brought by Administrator, Motor Vehicles Administration (the Administrator) from a declaratory judgment and injunction entered against him in the Circuit Court for Carroll County (Weant, J.) on May 25, 1972. The court ruled in favor of appellees, who are a group of automobile "wreckers" licensed pursuant to Code (1957, 1970 Repl. Vol.) Art. 66½, § 5-201. The

judgment from which the appeal is taken declared unconstitutional, and permanently enjoined the Administrator from enforcing, a key provision in § 5-203(d) of Art. 66½, on the basis that it violates the Equal Protection Clause of the Fourteenth Amendment.

Also, in a cross-appeal from the same judgment, appellees present a number of issues which were also raised in the trial court. Since we have determined that the cross-appeal must be dismissed, we shall state our reasons for doing so at the outset.

This case began with an action at law for declaratory judgment and injunctive relief filed by appellees against the Administrator in which they allege various infirmities, mostly on constitutional grounds, in Chapter 556, Laws of Maryland, 1969, and Chapter 534, Laws of Maryland, 1970, with specific reference to those portions which are now designated as Code (1957, 1970 Repl. Vol.) Art. 66½, §§ 5-201 through 5-208.

When the case came on for trial before Judge Weant on September 29, 1971, testimony was heard from several witnesses. After it had been held *sub curia,* additional testimony was heard on March 27, 1972, and on April 28, 1972, the trial judge filed a carefully-considered opinion which dealt fully with the several issues which had been presented to him. Although styled an "Opinion And Order," it is clear that it was merely an opinion and not an order. This is evident from the final sentence which directed counsel for appellees to "present an order providing for judgment and decreeing injunctive relief in accordance with this opinion." Moreover, the order, signed and filed on May 25, 1972, opens with these words: "Upon the aforegoing opinion (mistakenly entitled *Opinion and Order*). . . ." (italics in original)

The order of May 25, from which both appeals were taken, was confined to a declaration that the statutory provision mentioned earlier is unconstitutional, and enjoined its enforcement. Although by its opinion, the court purported to hold against appellees with respect to the

remaining issues they had raised, the order itself is devoid of any reference to them. In short, the court, in concise fashion, ruled against the Administrator on the single basis stated above, and rendered no further decision. The effect of all this is to place appellees in the position of cross-appealing from an order in which they are the prevailing parties. Generally, a party cannot appeal from a judgment or order which is favorable to him, since he is not thereby aggrieved. *Wright v. Baker,* 197 Md. 315, 79 A. 2d 159 (1951); *Mugford v. Baltimore,* 185 Md. 266, 44 A. 2d 745 (1945). In *Mugford,* Judge Grason, speaking for the Court, put it rather succinctly:

> "It needs no authorities to support the proposition that one cannot appeal from a decree wherein the relief he prays for has been granted." 185 Md. at 269.

While we regard *Mugford* as controlling against appellees, a motion to dismiss the appeal there was denied, since the declaratory decree, although essentially favorable to the appellant, did explicitly rule against him on a minor point which this Court therefore held reviewable.

The case at bar is not to be confused with the line of authority which says that a party, dissatisfied with the amount of a verdict, may appeal even though the judgment on that verdict is in his favor. *Turner v. Wash. Sanitary Comm.,* 221 Md. 494, 504, 158 A. 2d 125 (1960); *Jenkins v. Spedden,* 136 Md. 637, 642, 111 A. 136 (1920); *Baer v. Robbins,* 117 Md. 213, 225, 83 A. 341 (1912). Nor are we concerned here with a cross-appeal taken by a prevailing party in order to preserve his right of review upon adverse rulings made during the course of trial. *Fennell v. G.A.C. Finance Corp.,* 242 Md. 209, 229, 218 A. 2d 492 (1966); *Reece, Adm'r v. Reece,* 239 Md. 649, 212 A. 2d 468 (1965).

It is arguable, perhaps, that the conspicuous omission of any reference to the other grounds asserted by ap-

pellees following the thorough treatment of those points in the opinion amounted to an implicit ruling upon them. We think it more likely that the trial judge intended to confine his decision to the issue explicitly mentioned in the judgment, apparently because he believed that appellees required only one reason for prevailing. That he considered them the winners is fairly demonstrated, we think, by his provision in the order for "the defendant [appellant] to pay the costs. . . ."

Although, as we noted earlier, the opinion fully considered the points sought to be raised by the cross-appeal, it is well settled that an appeal will not lie from the trial judge's opinion, since it forms no part of the judgment. *McCann v. McGinnis*, 257 Md. 499, 263 A. 2d 536 (1970) ; *Mattingly v. Houston*, 252 Md. 590, 250 A. 2d 633 (1969) ; *Hayman v. Messick*, 252 Md. 384, 249 A. 2d 695 (1969).

While we must dismiss the cross-appeal for the foregoing reasons, it is not inappropriate for us to note here, having thoroughly reviewed the entire record, that even if we were free to pass upon the merits of the cross-appeal, we would reach the same result.

We turn, then, to the single question presented by the Administrator's appeal in which he attacks the trial court's ruling that the assessment provision of § 5-203 (d) is violative of the Equal Protection Clause of the Fourteenth Amendment.

In 1969, the General Assembly enacted Senate Bill 30, which became Chapter 556, Laws of Maryland, 1969. While, in customary fashion, it repealed several existing sections of Article 66½, the title also stated that the Act provided "for the disposal of abandoned motor vehicles, the licensing of wreckers and scrap processors of motor vehicles, the procedure for notifying the Department of Motor Vehicles of the scrapping, dismantling or destroying of motor vehicles, the authority of the Commissioner of Motor Vehicles [now known as Administrator, Motor Vehicle Administration] to promulgate rules and regu-

lations relating to records and scrap processors, . . . [and] the payment of a fee for the destruction of motor vehicles . . . ."

In the following year, by Chapter 534, the Act was amended in certain respects when Article 66½ was repealed and reenacted in its entirety. With the latter enactment, came the Code designation now known as Subtitle 5, *"Licensing of Dealers, Wreckers, Scrap Processors and Vehicle Salesmen."* It is "Part II. Wreckers and Scrap Processors" (§§ 5-201 through 5-210) that gives rise to these proceedings.

Section 5-201 makes it unlawful "to store any vehicle, or body or chassis thereof, which is to be scrapped, dismantled, or destroyed, on any private property for a period in excess of thirty days, unless" licensure as a wrecker or scrap processor is obtained. Section 5-201.1 defines "scrap processor" as "an establishment having facilities for processing iron, steel and nonferrous scrap metal and whose principal product is scrap iron, steel and nonferrous scrap for sale for resmelting purposes only," and defines a "wrecker" as an establishment "engaged in the business of purchasing or otherwise acquiring vehicles for the benefit of the materials contained therein or parts thereof." Section 5-202 provides in pertinent part that: "No wrecker or scrap processor shall be entitled to obtain a license unless:

\* \* \*

"6. The fee of $15 is paid to the Department for the issuance of such wrecker's license and a fee of $100 is paid to the Department for the issuance of such scrap processor's license . . . .

"7. A copy of the application shall be submitted to the State Department of Health for its comments on matters pertaining to air pollution and health generally.

"8. In the case of a scrap processor, he maintains a hydraulic baler and shears, or a shred-

der, or such other equipment suitable for processing motor vehicle scrap as required by regulation of the Department . . . ."

Section 5-203, Subsections (a) through (c), imposes certain notice and titling requirements attendant to the acquisition and disposal of vehicles. Subsection (d), the subject of this appeal, authorizes the promulgation of rules and regulations pertaining to notification of receipt of vehicles "and the manner in which an assessment is placed upon a *wrecker* if a vehicle or body or chassis thereof has a designated model year in excess of seven years as determined by a national publication of used car values adopted for use by the Department [and] is not scrapped, dismantled, or destroyed within one year from the date a wrecker acquires possession of the vehicle or body or chassis thereof, and the assessment shall be in the amount of $5 for each and every six (6) month period the vehicle or body or chassis thereof remains not scrapped, dismantled, or destroyed." [1] (emphasis added)

Section 5-205 provides for payment of a "bounty" of $10.00 for each vehicle completely destroyed, to be equally divided between the wrecker conveying ownership and the scrap processor attending to its destruction.[2]

Prior to the 1969 enactment, wreckers and scrap processors were the subjects of modest regulation under the Motor Vehicle Code, and surely were not part of a comprehensive scheme. Such regulation as did exist was aimed at them almost entirely with respect to the titling and registration of vehicles. In fact, it not only appears that scrap processors had been previously unmentioned by that name, but also that they were largely ignored in the original version of Chapter 556, which dealt mainly with wreckers before the bill was amended. Illustrative

---

1. At the 1972 session, this was extended from seven to ten years. The legislature also provided that for purposes of the assessment, vehicles shall not include trucks, truck tractors or trailers.

2. At the 1972 session, the General Assembly increased the "bounty" to $12.00, to be equally divided between wrecker and scrap processor.

of the modest role which the processors were originally intended to play is that initially they were not covered by the requirements for licensing, license fees and heavy equipment.

Mounting a full-scale attack on Part II, including virtually every provision to which we have just referred, appellees filed their action at law, seeking a declaration of unconstitutionality and appropriate injunctive relief. In so doing, they charged that the Acts of 1969 and 1970, respectively, violate Art. 3, § 29 of the Maryland Constitution because the titles embrace more than one subject and do not properly describe its subject matter; that the Acts constitute zoning legislation in contravention of Article 66B; that since the wreckers already pay a tangible personal property tax on vehicles held by them, the $5.00 assessment imposed by § 5-203 (d) results in double taxation; that the Acts violate the Fourteenth Amendment by depriving them of their property without due process of law; that they constitute an unreasonable exercise of the police power; and finally, that since the $5.00 assessment is imposed upon wreckers and not upon scrap processors, it is arbitrary and discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment. The last claim was sustained by Judge Weant, and that ruling is the subject of this appeal. The remaining contentions were the subject of the cross-appeal, which we have already indicated we must dismiss.

At the hearings in the circuit court, appellees sought to establish that wreckers and processors are similarly situated and should not be treated differently in the statutory scheme, by testimony that appellees had purchased used parts from scrap processors on two or three occasions; and that some processors had engaged in storage as if they were wreckers. Furthermore, they urged, cars over seven years of age are popular, and a great demand for parts replacement exists since they are largely unobtainable from more conventional sources.

As this summary might suggest, the evidence produced by appellees to support their claim of discrimination was sparse. Their testimony seemingly boils down to a claim that increased regulation possibly will add to the cost of doing business, a contention which is unlikely to evoke vigorous dissent.

On the other hand, there was testimony from two appellees which completely belied their basic argument that there are no differences in the respective operations of wreckers and scrap processors. Since the most profitable phase of the wrecking business is said to be the sale of used parts, one might wonder why the parts are not quickly removed from the used cars and stored separately so as to be more readily available for customers, thereby freeing the automobile hulks for prompt destruction. The response to that query was that it would not be economically feasible to inventory parts in that manner, and that it was more advantageous to store them by leaving them in place; hence, the larger the number of cars in storage, the greater the inventory of parts.

Actually, the testimony presented by both sides was consistent with the distinctions made by the statutory definitions of wreckers and scrap processors, and reflected rather overwhelmingly that it is in the best interests of wreckers to store old cars, whereas the reverse is true of scrap processors.

As further evidence of the differences in the two industries, witnesses pointed out that in compliance with § 5-202, processors were required to maintain equipment capable of processing vehicles so that they could be resmelted. One witness described wreckers as being generally interested in the sale of used parts obtained by stocking large inventories of whole automobiles, while scrap processors were concerned with destroying the vehicles for resmelting purposes. That the equipment which scrap processors are required to maintain is costly was illustrated by testimony that one particular processor, so equipped, could handle a car every minute, and re-

quired five hundred cars a day to achieve maximum efficiency.

Employees of the Motor Vehicle Administration, engaged in supervising the two industries, furnished impressive statistics showing that only five per cent of the automobiles in use are over seven years of age. They also pointed out that the underlying purpose of Part II was to arrest the problems developing from the storage of old automobiles, which had become a cause for concern in terms of environmental health. There was evidence, for example, that some hulks have remained undisturbed so long that they have become infested with rodents. The purpose of the law, therefore, was to halt the growth of this trend and to induce recycling of vehicles which had fallen into disuse. The bill, when first introduced, provided for the assessment without regard to the automobile's age. The wrecking industry involved itself in the legislative process, leading to the enactment of the seven-year requirement. The same efforts apparently led to the amendment in the payment of the bounty to both processor and wrecker, and ultimately to the imposition of the $5.00 assessment upon automobiles only.

The Administrator urges us to reverse the trial judge's declaration that the $5.00 assessment imposed by § 5-203 (d) violates the Equal Protection Clause. He argues with considerable force that the distinction made by the General Assembly between wreckers and scrap processors bears a reasonable relation to the legislative purpose underlying the statute. In this connection, he reminds us that the trial judge found the legislation to be a proper exercise of the police power. The Administrator argues correctly that the burden of proving that a legislative enactment violates the Equal Protection Clause is upon the party who asserts that proposition, and says that the burden was not sustained in this case by appellees.

Appellees, on the other hand, maintain that the im-

position of the five-dollar assessment on wreckers constitutes invidious discrimination. What they appear to be saying, beyond merely pointing out the dissimilar treatment reflected by § 5-203 (d), is that the classifications are arbitrary and bear no reasonable relation to the legislation.

One of the leading cases decided by the Supreme Court on this issue is *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911), which this Court has cited with approval on more than one occasion. Referring to a contention similar to that advanced by appellees, the Court there said:

> "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these:
>
> "1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a *wide scope of discretion* in that regard, and avoids what is done only when it is without *any* reasonable basis and therefore is purely arbitrary.
>
> "2. A classification having *some* reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in *some* inequality.
>
> "3. When the classification in such a law is called in question, *if any state of facts reasonably can be conceived* that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.
>
> "4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. (citations omitted)" 220 U. S. at 78-79 (all emphasis added).

While more than sixty years have passed since that decision, in the course of which many cases have been decided on the same issue, the principles enunciated there have lost none of their vitality.

One of the three cases cited in the trial judge's opinion to support his conclusion that § 5-203 (d) violates the Equal Protection Clause, the other two being decisions of this Court, is *Royster Guano Co. v. Virginia,* 253 U. S. 412, 40 S. Ct. 560, 64 L. Ed. 989 (1920). There, the Supreme Court held unconstitutional a state income tax imposed upon the out-of-state business done by domestic corporations which also did business within the state, but which was not assessed at all to domestic corporations doing all their business outside the state. In so holding, that Court recited essentially the same principles we have quoted from *Lindsley.*

The Supreme Court noted that the statute was intended to exempt domestic corporations which did no business in Virginia because they derived no protection from the state. But, as that Court also noted, domestic corporations which also did some business within the state received no protection from Virginia with respect to their outside business, and yet were subject on that share of their business to taxation in the outside states. Thus, the Supreme Court said:

> "It is obvious that the ground of difference upon which the discrimination is rested has no fair or substantial relation to the proper object sought to be accomplished by the legislation. It follows that it is arbitrary in effect . . . ." 253 U. S. at 416.

We regard that case, as well as the two decisions cited by the trial judge, *Blaustein v. Tax Commn.,* 176 Md. 423, 4 A. 2d 861 (1939) and *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936), patently distinguishable from the case at bar.

In *Dasch,* heavily relied upon here by appellees, our predecessors were called upon to decide whether an act of the General Assembly regulating paperhangers was constitutional. There, as in this case, the constitutional attack rested upon several grounds in addition to the Equal Protection Clause. By its language, the Act applied only to those who engaged in the business of paperhanging in the City of Baltimore. In finding that statute to be violative of the Equal Protection Clause, this Court did not depart from the established principles we quoted earlier, but rather followed them in holding that no rational basis had been advanced for the territorial classification which resulted in regulation of paperhangers engaged only in the city. In addition to the obvious soundness of that holding, it is of no little significance that the opinion was devoted principally to a companion finding that the statute constituted an unreasonable exercise of the police power.

In *Blaustein,* this Court struck down, as being "an arbitrary and unreasonable discrimination between persons of the same general class," a statute which taxed the income of residents from intangible personal property held in trust for them by nonresident trustees where the donor or testator was a resident at the time he created the trust. Quoting with approval from *Guano,* this Court held that the tax was discriminatory since no tax was imposed on resident beneficiaries where the trusts were foreign in their inception or upon resident beneficiaries of wholly local trusts. Clearly, the classification did not rest upon any differences having a fair and substantial relation to the object of the legislation, and the holding that the Act was "arbitrary and unreasonable discrimination between persons of the same general class" was wholly consistent with decisions of the Supreme Court and this Court.

In ruling upon appellees' contention below that the effect of § 5-203 (d) is to impose a second property tax,

the trial judge reached the conclusion that the $5.00 assessment on wreckers is neither a property tax, as urged by appellees, nor a "penalty, fine, fee or forfeiture" as contended there by the Administrator, but that it is an excise tax imposed upon wreckers "for the privilege of storing" older vehicles. Calling the assessment a tax does not help appellees in regard to their equal protection argument. That the "traditional" or "fundamental" standard enunciated in *Lindsley, supra,* applies where tax statutes are challenged on equal protection grounds is clear. *Walters v. City of St. Louis, Mo.,* 347 U. S. 231, 74 S. Ct. 505, 98 L. Ed. 660 (1954) ; *Hooks v. Comptroller,* 265 Md. 380, 289 A. 2d 332 (1972) ; *Fair Lanes, Inc. v. Comptroller,* 265 Md. 361, 289 A. 2d 595 (1972). In *Fair Lanes,* where we quoted extensively from *Walters,* Judge Barnes, speaking for the Court, said:

> "The trend in the opinions of the Supreme Court of the United States . . . has been toward sustaining the power of the States to make valid classifications for purposes of taxation against attacks based upon the Fourteenth Amendment prohibition of a denial of equal protection of the laws. (citations omitted)" 265 Md. at 367.

In *Hooks,* following our prior decisions and those of the Supreme Court, Judge Singley said for the Court:

> "It has long been recognized that taxation is a practical affair, *Frank J. Klein v. Comptroller,* 233 Md. 490, 494, 197 A. 2d 243 (1964), and that 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes' can the presumption of constitutionality be rebutted. . . ." 265 Md. at 388.

In dealing with the equal protection issue in his opinion, Judge Weant appeared to be concerned that imposition of the $5.00 assessment only on wreckers would

leave scrap processors free to store automobiles with impunity. Indeed, it seems to us that this apprehension on his part does much to explain the conclusion which he reached. Apart from being without support in the record, that reasoning begs the question of whether the statute violates the Equal Protection Clause, and overlooks the controlling principles we have quoted.

The legislature manifestly determined that substantial differences existed in the respective functions of wreckers and scrap processors. Indeed, we find this apparent from the language of Part II itself which, in § 5-201.1, makes a lucid distinction in defining the two fields. The scrap processor is clearly identified by the heavy equipment requirement of § 5-202 as one whose objective is to destroy and dispose of vehicles, and not to store them as envisioned by the trial court.[3]

Although the question of whether this enactment constituted a reasonable exercise of the police power is not before us, the testimony clearly established that for reasons of environmental health, the legislation was designed to arrest the increasing accumulation of automobile hulks, and to promote their recycling. Even the appellees' testimony disclosed that the more vehicles beyond seven years of age they stored, the more lucrative their business was.

The trial judge's fear that scrap processors would store vehicles without paying the $5.00 assessment seemingly ignores the uncontradicted evidence that the desire to "feed" their extraordinarily expensive equipment which the statute requires them to maintain is a more compelling force than the storage of old vehicles in the tenuous expectation of an increase in scrap prices. Moreover, under the statute, scrap processors may not sell parts from vehicles they might chance to store without running afoul of criminal sanctions imposed by § 5-210. While there was evidence of two or three isolated sales made by processors, this problem is addressed to

---

3. It is perhaps of no little significance that the trial testimony disclosed only nine Maryland scrap processors to have been licensed.

the matter of administrative enforcement rather than discriminatory legislation.

There was testimony below showing that the storage of old vehicles by wreckers had become virtually an uncontrollable problem, posing a danger to environmental health. As evidence of the legislature's flexible approach to the problem, testimony revealed that the law originally contained no "seven-year provision," and that it was added after the wrecking industry involved itself in the legislative process.

Against the facial reasonableness of the statute and the testimony we have summarized, appellees did little more than bemoan their fate to the trial judge To be sure, the statute will tend to eliminate their "parts" business for vehicles over seven years of age, but, in view of the testimony, this does not portend the ominous results feared by them. In fact, the legislature, as we noted earlier, has continued to demonstrate its reasonableness by the enactment of Chapter 421, Laws of 1972, effective July 1, 1972, which amended § 5-203 (d) so as to increase the "seven" years to "ten" years. It simply strains our credulity to suggest that the survival prospects of over three hundred wreckers in this state will rise or fall on their ability to sell used parts for automobiles over ten years of age.

Contrary to appellees' claim, we think that the legislature's classification of wreckers and scrap processors in different categories with resulting differences in their treatment was reasonable rather than arbitrary. As we noted earlier, a cardinal rule to be observed in determining whether a statute is violative of the Equal Protection Clause is that the legislature exercises a broad scope of discretion in establishing classifications, subject only to the requirement of reasonableness in doing so. *Dandridge v. Williams,* 397 U. S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970) ; *McGowan v. Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961) ; *Royster Guano Co. v. Virginia; Lindsley v. Natural Carbonic Gas*

*Co.,* both *supra; Potomac Sand & Gravel v. Governor,* 266 Md. 358, 293 A. 2d 241 (1972) ; *Allied American Co. v. Comm'r,* 219 Md. 607, 150 A. 2d 421 (1959).

In sum, the evidence is uncontradicted, indeed, bolstered by appellees' own testimony, that the differences in classification and treatment which are reflected by the statutory scheme under attack here will reduce the extensive storage of old automobile hulks, and thereby their damage to the ecology. Suffice it to say that the legislature, in creating the classifications, intended this result. Central to the equal protection decisions is the proposition that legislative classification will be sustained if it rests upon some ground of difference having a fair and substantial relation to the object of the legislation. *Schilb v. Kuebel,* 404 U. S. 357, 92 S. Ct. 479, 30 L.Ed.2d 502 (1971) ; *McDonald v. Board of Election,* 394 U. S. 802, 89 S. Ct. 1404, 22 L.Ed.2d 739 (1969) ; *McGowan v. Maryland; Royster Guano Co. v. Virginia,* both *supra.* Furthermore, the classification here rests on real and not feigned differences. *Walters v. City of St. Louis, Mo.; Fair Lanes, Inc. v. Comptroller,* both *supra.* And, surely, it meets the test of whether "any state of facts reasonably can be conceived that would sustain it." *Schilb v. Kuebel; Dandridge v. Williams; McDonald v. Board of Election; McGowan v. Maryland; Lindsley v. Natural Carbonic Gas Co.; Potomac Sand & Gravel v. Governor; Allied American Co. v. Comm'r,* all *supra.*

A dominant theme distilled from the cases is that one who assails a legislative classification must sustain the burden of proving that it does not rest on any reasonable basis. *Lindsley v. Natural Carbonic Gas Co.; Potomac Sand & Gravel v. Governor; Allied American Co. v. Comm'r,* all *supra.* Although we may already have intimated our doubts that appellees sustained that burden here, we now dispel any lingering notions and state flatly that they have failed to do so.

For these reasons, the trial judge erred in declaring unconstitutional the imposition upon wreckers of the

$5.00 assessment in § 5-203 (d) upon the ground that it violates the Equal Protection Clause of the Fourteenth Amendment, and in enjoining its enforcement.

> *Judgment reversed; judgment entered declaring article 66½, § 203 (d) to be constitutional; cross-appeal dismissed; appellees to pay costs.*