## WILLIAM OFFUTT ET AL. *v.* MONTGOMERY COUNTY BOARD OF EDUCATION ET AL.

[No. 105, September Term, 1978.]

*Decided July 24, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Richard M. Schwartz,* with whom were *Lipshultz & Hone* on the brief, and by *Cathleen H. Douglas,* with whom were *Leva, Hawes, Symington & Oppenheimer* on the brief, for appellants.

*Walter S. Levin,* with whom were *Susan W. Russell* and *Sauerwein, Boyd, Decker & Levin* on the brief, for appellee Montgomery County Education Association. *Robert S. Bourbon,* with whom were *Kenneth F. Hickey* and *Morgan, Lewis & Bockius* on the brief, for appellee Montgomery County Board of Education.

ELDRIDGE, J., delivered the opinion of the Court.

This proceeding arises out of a labor dispute between a

group of public school employees on the one hand, and their union and the school system by which they are employed on the other hand.

The individual plaintiffs, plus the others in the class they purport to represent, comprise a group of approximately 1,800 "twelve-month" teachers, counselors, librarians and athletic coaches who are employed by the defendant, Montgomery County Board of Education (hereinafter sometimes referred to as the "School Board"). These plaintiffs, unlike the majority of county teachers who work only for the ten month school year, had contracts to work the entire year in the school system. This so called "twelve-month program" was initiated by the School Board in 1967, its purpose being to afford certain of the best qualified instructors the opportunity to teach summer school and also to "enrich" the curriculum. In addition, resource teachers, football coaches, librarians and guidance counselors were required by the School Board to accept twelve-month status as a condition of their employment.

In 1968, the General Assembly enacted legislation permitting collective bargaining for public school personnel, Ch. 483 of the Acts of 1968, and the defendant Montgomery County Education Association (hereinafter sometimes referred to as the "Association") is the collective bargaining representative for Montgomery County public school employees pursuant to that statute. Each year the twelve-month program has been subject to negotiation between the defendant Association and the defendant School Board. Prior to the 1976-1977 school year, the contracts negotiated between the School Board and the Association essentially provided that once an employee receives a year-round assignment, this status would continue without subsequent change to a 10 month position.

Faced with mounting financial problems, in the fall of 1975 the School Board first explored the idea of eliminating the twelve-month employment program as a means of saving money. This proposal was first publicly aired in a brochure, sent to the parents of school children, explaining the economic problems confronting the school system. In the brochure,

elimination of twelve-month personnel was discussed as a way to reduce expenditures without appreciably damaging the instruction program. Under this proposal, employees compensated on a per diem basis would be used to perform tasks previously done by twelve-month personnel during the summer.[1] Other cost cutting proposals, with varying educational and economic consequences, were also presented in the brochure. Later, several "town meetings" were held by the School Board in order to further acquaint parents with the poor financial situation affecting the schools. Public comment and suggestions were solicited to find ways to deal with the growing crisis.

On October 31, 1975, the Association presented to the School Board its initial list of demands for the 1976-1977

---

1. The School Board, in the brochure, explained the savings that would result from eliminating the twelve-month program as follows:

"At present, 1,815 teachers are in the 12-month program. In the summer of 1975, they were employed ... for the two summer months. The approximate dollar cost of their salaries and fringe benefits for those two additional months is $6.7 million.

"If the 12-month program were abolished, teachers could be employed on a per diem rate (an average of $85.25 a day including fringe benefits) to perform the same services as last summer at a cost of $4.8 million. This option would reduce the annual income of those in the 12-month program by approximately $880 each, but opportunities for summer employment would be available to more teachers.

"If all curriculum and staff development were eliminated; if librarians, counselors, resource teachers and teacher specialists were limited to 20 work days (one month) and football coaches received stipends; and summer school was maintained at present levels, all on a per diem basis, the total cost would be $2.2 million. If curriculum and staff development were reduced to half of last summer's level, but on a per diem basis, the cost would increase to $3.0 million.

"If the 12-month program were abandoned, savings in the first year would not be as significant as in the future because those now in the program would have to be paid for accumulated annual leave. We estimate that the average 12-month teacher will have approximately 11 days of unused annual leave. The cost of paying this off at present salary levels would be about $1.6 million. Thus, the savings quoted above would have to be reduced by $1.6 million for Fiscal 1977.

"One significant impact of eliminating the 12-month program would be on the annual income of present 12-month teachers. Average annual salary loss would range from $880 (for a person reemployed as a summer school teacher at the per diem rate) to $3,650 (for a person not hired for any summer work)."

school year contract. Included within this list was the continuation and expansion of the twelve-month program. The School Board responded by announcing its intent to abolish the twelve-month program. After several negotiating sessions in which both sides adhered to these positions, pursuant to Maryland Code (1978), § 6-408 (d) of the Education Article, an impasse was declared.[2] In accord with this section, a mediation panel was set up and a contract finally arrived at between the parties. The result of the mediation was that the twelve-month program was terminated; however, the former twelve-month personnel were guaranteed a minimum amount of summer employment, to be paid on a per diem basis for any days actually worked. This contract was ratified by a majority of the membership of the Association and unanimously approved by the Montgomery County School Board.

Some of the former twelve-month teachers and administrators, being dissatisfied with the new contract, filed in the Circuit Court for Montgomery County, on behalf of themselves and others similarly situated, a bill of complaint, naming as defendants the Montgomery County School Board and the Montgomery County Education Association. It was alleged, *inter alia,* that the School Board failed to negotiate the continued existence of the twelve-month program in good faith, but instead, in violation of § 6-408, unilaterally abolished these positions. It was further alleged that the Association failed to represent the plaintiffs "fairly and without discrimination" as required by § 6-407 (b). The plaintiffs requested an injunction against the implementation of the new contract provisions to the extent that they related to the twelve-month program. They also sought to have the twelve-month program made the subject of renegotiation between the School Board and the affected personnel.

The defendant Association filed a motion raising

---

2. At the time that this case arose, the provisions dealing with labor matters in the public school system were codified in Maryland Code (1957), Art. 77. By Ch. 22 of the Acts of 1978, these provisions were placed in Code (1978), Title 6 of the Education Article. Because this recodification made no changes pertinent in this case, the references in this opinion shall be to the current code sections.

preliminary objection, arguing that primary jurisdiction was in the Maryland State Board of Education and that the plaintiffs should first exhaust their administrative remedy before the State Board. The circuit court, agreeing with this argument, stayed the action pending proceedings before the State Board on the issues raised by the bill of complaint.

The plaintiffs then filed a petition with the State Board, repeating the allegations in their circuit court bill of complaint. After a full hearing, a hearing examiner for the State Board of Education held in favor of both defendants, finding, *inter alia,* that the Montgomery County Board of Education negotiated the 1976-1977 agreement in good faith and that the Montgomery County Education Association did not breach its statutory duty to fairly represent the twelve-month employees. The State Board of Education agreed with this result and adopted the opinion of the hearing examiner.

The twelve-month employees, pursuant to Code (1957, 1978 Repl. Vol.), Art. 41, § 255, and Maryland Rule B1 *et seq.,* appealed this ruling to the Circuit Court for Montgomery County. The circuit court consolidated the administrative appeal with the original equity suit in which proceedings had been stayed. In reviewing the decision of the State Board, the circuit court upheld the findings of the State Board on all matters raised with one exception. Specifically, the court held that substantial evidence supported the State Board's finding that the Association did not breach its duty to fairly represent the plaintiffs. The court observed that "the record reveals that [the Association] acted in good faith, that it actually proposed an expansion of the program and its benefits, and that it took the 12 month issue to impasse." The one exception was that the circuit court held the State Board's finding of good faith negotiations by the School Board to be unsupported by substantial evidence. Notwithstanding this latter holding the court decided that there was no appropriate remedy then available. Consequently, the circuit court upheld the ultimate decision of the State Board in favor of the

defendants, and it dismissed the plaintiffs' bill of complaint in the equity action, observing:

"Any damages claimed by the twelve month personnel are necessarily speculative, since it is impossible to determine at what rates they would have been paid had an agreement been negotiated in complete good faith by both parties. Furthermore, it is impossible to determine whether the County Council would have included enough money in the County Board's budget to pay the teachers at whatever rate of pay could have been negotiated. To order renegotiation of an already expired agreement would be pointless."

The plaintiffs then filed an appeal to the Court of Special Appeals, challenging the lower court's ruling that there was no remedy currently available for the School Board's failure to negotiate in good faith. They did not contest, however, the State Board's finding, upheld by the circuit court, that the Association fairly represented them in the bargaining process. The School Board in turn filed a cross appeal, taking issue with the lower court's holding that the Board failed to negotiate in good faith as required by § 6-408. Prior to a hearing in the Court of Special Appeals, we issued a writ of certiorari.

We shall affirm the judgment below, although on a ground not relied upon by the circuit court and not suggested by the parties.[3] In light of the finding by the State Board that the Association did not breach its duty to fairly represent the former twelve-month employees, which finding was upheld by the circuit court and is not challenged on appeal, the twelve-month employees are bound by the collective bargaining agreement entered into between their representative and the School Board. They are not entitled to

---

3. We granted certiorari in this case on our own motion; therefore, under Maryland Rule 813 b 2, we will consider any issues which would be cognizable by an appellate court on direct appeal. An appellate court may, on a direct appeal, affirm a trial court's decision on any ground adequately shown by the record, even though not relied on by the trial court or the parties. Robeson v. State, 285 Md. 498, 403 A. 2d 1221 (1979), and cases there cited.

have certain provisions of that agreement set aside or renegotiated, regardless of whether the School Board negotiated in good faith with the Association. For this reason, the twelve-month employees were not entitled to the relief sought, and the final judgment of the circuit court denying them relief should be affirmed. Consequently, we do not reach the issues raised by the plaintiffs on appeal or the defendant School Board on its cross-appeal, and the cross-appeal will be dismissed.[4]

Section 6-402 of the Education Article authorizes public school personnel to form and participate in employee organizations which are designed to represent the employees on all matters relating to "salaries, wages, hours, and other working conditions." Sections 6-404 and 6-405 set forth how a particular employee organization can be designated the "exclusive representative of *all* public school employees in a specified unit in the county." Once a particular employee organization is selected in accordance with the above provisions, its basic authority and obligations are set forth in § 6-407, which provides:

> "(a) *Negotiating agent.* — An employee organization designated as an exclusive

---

4. It should be pointed out that, as a procedural matter, the cross-appeal in this case does not properly lie. Although the defendant School Board may not like the language in the trial court's opinion stating that the Board bargained in bad faith, the final judgment of the trial court, by denying any relief to the plaintiffs, is entirely in the School Board's favor. It is established as a general principle that only a party aggrieved by a court's judgment may take an appeal and that one may not appeal or cross-appeal from a judgment wholly in his favor. Adm'r, Motor Veh. Adm. v. Vogt, 267 Md. 660, 664, 299 A. 2d 1 (1973); Wright v. Baker, 197 Md. 315, 318, 79 A. 2d 159 (1951); Mugford v. City of Baltimore, 185 Md. 266, 269, 44 A. 2d 745 (1945); Riley v. Naylor, 179 Md. 1, 8, 16 A. 2d 857 (1940); Whitridge v. Pope, 110 Md. 486, 488, 73 A. 288 (1909); Hanson v. Worthington, 12 Md. 418, 443 (1858); Ringgold v. Barley, 5 Md. 186, 195 (1854). *See also* Benson v. Board of Ed. of Mont. Co., 280 Md. 338, 354, 373 A. 2d 926 (1977), and cases there cited.

Where a party has an issue resolved adversely in the trial court, but like the School Board here receives a wholly favorable judgment on another ground, that party may, as an appellee and without taking a cross-appeal, argue as a ground for affirmance the matter that was resolved against it at trial. St. Comm'n On Human Rel. v. Amecom Div., 278 Md. 120, 123 n. 2, 360 A. 2d 1 (1976); Capron v. Mandel, 250 Md. 255, 259, 241 A. 2d 892 (1968). This is merely an aspect of the principle that an appellate court may affirm a trial court's decision on any ground adequately shown by the record. *See* n. 3, *supra.*

representative shall be the negotiating agent of all public school employees in the unit in the county.

"(b) *Fair representation.* — An employee organization designated as an exclusive representative shall represent all employees in the unit fairly and without discrimination, whether or not the employees are members of the employee organization. . . ."

Thus, the employee organization has the duty of fairly representing the employees in the bargaining unit and is empowered to be the negotiating agent for "all" of the employees in that unit. Once the representative has negotiated a collective bargaining agreement, and the majority of the employees in the unit have approved that agreement, as happened in the instant case, it would be inconsistent with the concept of collective bargaining if a dissatisfied minority of the unit were not bound by the agreement and could have it set aside on grounds such as asserted in this case.

A leading case setting forth the broad scope of a collective bargaining representative's authority is *Ford Motor Co. v. Huffman,* 345 U. S. 330, 73 S. Ct. 681, 97 L. Ed. 1048 (1953). There, a group of employees, dissatisfied with certain provisions of a collective bargaining agreement, filed a class action against their employer, the Ford Motor Company, and their union, challenging the validity of these provisions. Under the agreement certain military veterans who began their employment with Ford after being discharged from military service were given seniority status above that of the plaintiffs, whose employment had predated these veterans. The plaintiffs complained that their position on the seniority roster had been lowered due to the collective bargaining agreement's preferential treatment of veterans. They sought a declaration that the agreement prejudicing their seniority rights was invalid and an injunction against both the union and the employer. In holding that the union was authorized to enter the agreement, the Supreme Court commented on the breadth of the collective bargaining representative's authority, noting that it is limited by the duty to represent

honestly and fairly the interests of all of the members of the appropriate labor unit. 345 U. S. at 337. The Court then went on to discuss the wide latitude given the negotiators in collective bargaining (*id.* at 337-338):

> "Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. A bargaining representative . . . often is a labor organization but it is not essential that it be such. The employees represented often are members of the labor organization which represents them at the bargaining table, but it is not essential that they be such. The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

In many cases, the courts have refused to allow a minority group of employees to set aside a collective bargaining agreement in a suit against their employer, once it was determined that the labor organization satisfied its duty of fairly representing the employees. *Humphrey v. Moore,* 375 U. S. 335, 84 S. Ct. 363, 11 L.Ed.2d 370 (1964), involved an

agreement between two competing companies whereby one would curtail its operations in a certain locale. The employees working for both companies were represented by the same union. In order to equitably treat all union members, the labor organization arrived at a plan whereby the employees with the greatest amount of seniority at both businesses would be permitted to work for the continuing company. Dissatisfied with such an arrangement, a class action was commenced by employees of the ongoing business against both their union and employer, alleging, *inter alia,* that they lacked legal authority to agree to dovetail the seniority lists, that the union breached its duty to fairly represent them, and that the agreement was contrary to precedent and existing practices in the industry. After finding no support for the contention concerning lack of authority to make an agreement, the Court stated with regard to the fair representation question (375 U. S. at 349):

> "[W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another."

Examining all of the surrounding circumstances motivating the union to act, the Court found that the evidence failed to show a breach by the union of its duty of fair representation. Thus, finding the parties to be empowered to arrive at the agreement, and also being of the view that the union had fulfilled its duty of fairly representing its constituents, the Court held that the complaining union members were bound by the action taken by their "exclusive bargaining agent."

Another leading Supreme Court decision in this area is *Vaca v. Sipes,* 386 U. S. 171, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967). There, a worker was discharged from his position because of poor health. Pursuant to a collective bargaining agreement between the union and the employer, the union filed a grievance in an attempt to get the employee reinstated. However, after pursuing the grievance through several steps

of the mandated procedures, the union decided to drop the claim after considering certain independently obtained medical evidence. The employee then filed an action against the union for damages, alleging that he had been discharged by the employer in violation of the collective bargaining agreement and that the union had arbitrarily and capriciously refused to take his grievance to arbitration. The Supreme Court of Missouri reinstated a jury verdict in favor of the plaintiff, finding that the union had acted arbitrarily in not pursuing the grievance and further, that the evidence demonstrated that the employee had been wrongfully discharged by his employer in violation of the collective bargaining agreement. The Supreme Court of the United States reversed, declaring that the controlling question was not whether the employer in fact breached the labor agreement, but whether the union had fairly represented the employee's claim. The Court found that the union made an objective and independent appraisal of the propriety of the plaintiff's discharge and, in good faith, decided to abandon pursuing the claim to arbitration. It noted the central role played by the union in the implementation of the collective bargaining agreement, commenting (386 U. S. at 191):

> "If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation."

The Court went on to hold that before the employee could be awarded damages for his wrongful discharge, he must first establish that the union breached its statutory duty of fair representation. The Supreme Court was of the view that no individual cause of action would lie, regardless of whether the employer had violated the provisions of the collective bargaining agreement, unless the union had also breached its duty to fairly represent the employee in the matter.

In the instant case, we are faced with a similar situation.

A group of employees are attempting to by-pass their duly authorized representative and obtain relief from the provisions of an agreement which the union was authorized to make. Although here, unlike *Vaca,* the employer is also a defendant, this distinction is of no consequence. The Supreme Court made it clear in *Vaca* that its holding applies with equal force where the employer is being sued, for the Court commented that "in fact, the employer may be (and probably should be) joined as a defendant in the fair representation suit, as in *Humphrey v. Moore, supra.*" 386 U. S. at 197.

Recently, in *Emporium Capwell Co. v. Western Addition Commun. Org.,* 420 U. S. 50, 95 S. Ct. 977, 43 L.Ed.2d 12 (1975), the Supreme Court reasserted the principles set forth in *Ford Motor Co. v. Huffman, supra; Humphrey v. Moore, supra;* and *Vaca v. Sipes, supra.* In the *Emporium Capwell Co.* case, several dissident employees were fired for picketing and attempting to bargain directly with their employer to eliminate racially discriminatory practices. Instead of utilizing the grievance procedures called for in the collective bargaining agreement to process these complaints, the dissidents, contrary to the wishes of the union, attempted unsuccessfully to bargain for the elimination of these racially prejudicial policies. Failing to heed company warnings to cease their protestations, the employees involved were fired. They then filed a complaint with the National Labor Relations Board, alleging that their discharge amounted to an unfair labor practice under § 8 (a) (1) of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U.S.C. § 158 (a) (1). Addressing this contention the Supreme Court first summarized the views of the Board (420 U. S. at 58):

> "[It] concluded that protection of such an attempt to bargain would undermine the statutory system of bargaining through an exclusive, elected representative, impede elected unions' efforts at bettering the working conditions of minority employees, 'and place on the Employer an unreasonable burden of attempting to placate self-designated representatives of minority groups while abiding by the terms of a valid bargaining

agreement and attempting in good faith to meet
whatever demands the bargaining representative
put forth under that agreement.' "

The Court went on to note that the wishes of the majority may
at times displace the desires of the minority. However, the
Court was careful to point out that the duty imposed upon the
union to fairly and in good faith represent all employees,
including those with minority positions, served to protect all
employees. It concluded that the grievance procedure could
not be short-circuited by the plaintiffs' attempts to bargain
directly with the employer.

In the present case, the twelve-month teachers are similarly
attempting to by-pass the authority of their designated labor
representative and secure benefits to themselves directly
from the employer. Whatever acts of misconduct (if any) may
have been perpetrated by the School Board, they are, like the
alleged discrimination by the employer in *Emporium Capwell
Co.,* of no significance. If the matter involved is properly for
the union to negotiate, once the union fulfilled its duty to
fairly represent the employees, it alone may pursue avenues
of relief against the employer. For, as stated by the Supreme
Court in *Emporium Capwell Co.* (420 U. S. at 62):

"In establishing a regime of majority rule, Congress
sought to secure to all members of the unit the
benefits of their collective strength and bargaining
power, in full awareness that the superior strength
of some individuals or groups might be subordinated
to the interest of the majority. *Vaca v. Sipes,* 386 U.
S. 171, 182 (1967) .... As a result '[t]he complete
satisfaction of all who are represented is hardly to
be expected.' *Ford Motor Co. v. Huffman,* 345 U. S.
330, 338 (1953)."

In several lower federal appellate cases, involving suits
against employers and unions by employees dissatisfied with
negotiated agreements, under factual circumstances quite
analogous to those in the case at bar, the courts have applied
the principles set forth in the above-cited Supreme Court
cases and, deciding that there was no breach of the unions'

duty of fair representation, upheld dismissals of the actions against the employers. *See, e.g., Battle v. Clark Equipment Co.,* 579 F. 2d 1338 (7th Cir. 1978); *Dwyer v. Climatrol Industries, Inc.,* 544 F. 2d 307 (7th Cir. 1976), *cert. denied,* 430 U. S. 932, 97 S. Ct. 1553, 51 L.Ed.2d 776 (1977); *Corcoran v. Allied Supermarkets, Inc.,* 498 F. 2d 527 (8th Cir. 1974).

In the present case, the Association, as the exclusive bargaining representative of the public school employees, was authorized to negotiate the collective bargaining contract for the twelve-month employees. The employees who are dissatisfied with that agreement have acquiesced in the holding that the Association did not breach its duty to fairly represent them. Consequently, any complaints about the manner in which the School Board negotiated with the Association were for the Association to have made and pursued. Since the Association evidently had no such complaints, but was able to negotiate an agreement approved by the majority of the bargaining unit, the plaintiffs are bound by their representative's action.

> *Cross-appeal dismissed.*
> *Judgment affirmed.*
> *Appellants to pay costs.*