# HEALTH SERVICES COST REVIEW COMMISSION v. HOLY CROSS HOSPITAL OF SILVER SPRING, INCORPORATED ET AL.

[No. 43, September Term, 1980.]

*Decided April 23, 1981.*

*Motion by Blue Cross of Maryland for leave to file a motion for reconsideration denied June 29, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Jay E. Levy, Assistant Attorney General,* with whom were *George A. Nilson, Deputy Attorney General,* and *Stanley Lustman, Assistant Attorney General,* on the brief, for appellant.

*Richard C. Shadyac,* with whom were *Metzger, Shadyac & Schwarz* on the brief, and by *C. Michael Loftus,* with whom were *Slover & Loftus* on the brief, for appellees.

*Amici curiae* brief of Maryland Radiological Society, Inc. and Michael L. Sherman, M.D. filed. *Melvin J. Sykes, M. Peter Moser* and *Frank, Bernstein, Conaway & Goldman* on the brief.

*Amicus curiae* brief of Medical and Chirurgical Faculty of Maryland filed. *John F. King, M. Bradley Hallwig* and *Anderson, Coe & King* on the brief.

*Amicus curiae* brief of The Maryland Society of Pathologists, Incorporated filed. *George T. Tyler* on the brief.

*Amicus curiae* brief of Groover, Christie and Merritt, P.C. filed. *Alfred L. Scanlan* and *Shea & Gardner* and *William S. Moore* on the brief.

SMITH, J., delivered the opinion of the Court. ELDRIDGE and DAVIDSON, JJ., dissent. DAVIDSON, J., filed a dissenting opinion at page 519 *infra,* in which ELDRIDGE, J., concurs.

SMITH, J., delivered the opinion of the Court on the motion by Blue Cross of Maryland, Inc., for leave to file a motion for reconsideration as *amicus curiae* at page 548 *infra.* DAVIDSON, J., dissents.

In this case, which probably will become known as *"Holy Cross* III," we shall hold that a trial judge was right for the wrong reason in his determination of an appeal from the Health Services Cost Review Commission (the Commission). We conclude that since the commission failed to establish that the term "total costs of the hospital" at the time of the enactment of the statute creating the Commission in 1971 was "a term 'of art' in the health care field having a well understood meaning different from its common signification which would include the fees of the physicians here," the statute provides no authority to the Commission to regulate the professional fees here under consideration.

For a clear understanding of the issue currently before the Court we first refer to *Holy Cross Hosp. v. Health Services,*

283 Md. 677, 393 A.2d 181 (1978), "*Holy Cross* I."[1] We opened that opinion by saying:

> We are here involved as a matter of statutory construction with the question of whether fees charged by physicians in certain medical specialties to hospital patients, which fees are placed on hospital accounts and billed by the hospitals in such amounts to the patients, constitute a part of "the total costs of the hospital" so as to be considered as "reasonably related to the total services offered by the hospital" and thus whether the Maryland Health Services Cost Review Commission (the Commission) is empowered to review and set charges by these physicians in the specialties of cardiology, pathology, and radiology.
>
> The Commission was created by Chapter 627 of the Acts of 1971. Certain revisions have been made since that date. See Maryland Code (1957, 1971 Repl. Vol., 1978 Cum. Supp.) Art. 43, §§ 568H-568Z. [*Id.* at 679-80.]

After public hearings relative to Holy Cross, the Commission on December 1, 1976, issued a proposed opinion and order in which it found "that the salaries of the radiologists, pathologists and cardiologists [were] subject to [its] review as a part of [the Commission's] legislative charge to assure the public that total costs are reasonably related to total services provided." This was subsequently modified "to read 'compensation' rather than 'salary' . . . ." Holy Cross sought judicial review in the Circuit Court for Montgomery County. Certain physicians were permitted to intervene. Three issues were addressed by that court, (1) whether the Commission had jurisdiction to determine the rate charged by pathologists, radiologists, and cardiologists for their services rendered to patients of Holy Cross, (2) whether the Commis-

---

1. *Holy Cross* II was Maryland Radiological v. Health Serv., 285 Md. 383, 402 A.2d 907 (1979). It concerned the attempt of Maryland Radiological Society and others to intervene after our remand in *Holy Cross* I.

sion's restructuring of the rate schedules was so arbitrary and capricious as to deny the hospital and physicians due process of law, and (3) whether the Commission's action in excluding patient telephone charges from the basic room rate was arbitrary and capricious. The trial judge found for the Commission on the first and third issues but against it on the second issue. Hence, he reversed the order of the Commission and remanded the case to it for further proceedings. Since the circuit court's determination on the first issue was adverse to them, Holy Cross and the physicians appealed to the Court of Special Appeals. We granted the writ of certiorari prior to consideration of the case by that court.

In *Holy Cross* I we pointed out that a number of contentions were made to us by the hospital and the physicians as to why the Commission might not do that which it sought to do. We focused, however, "only on the question of whether the charges by these specialists are a part of 'the total costs of the hospital,' since if they [were] not there [was] no need to consider the other objections." *Id.* 283 Md. 683. We examined the statute in question and reviewed our cases relative to statutory construction. We then pointed out that "for the Commission to have the power it seeks it must be determined that the charges of these physicians constitute a part of 'the total costs of the hospital . . . .' " *Id.* 283 Md. at 688. After examination of the definitions of the noun "cost" and the preposition "of" appearing in Webster's New International Dictionary of the English Language (2d ed. unabr. 1959) we concluded that " 'total costs of the hospital' means the Hospital's expenditures or outlays of money in connection with the operation of the Hospital." *Id.* at 689. We then determined:

> [O]n the record before us we are unable to agree with the conclusion of the trial judge or the conclusion of the Commission that the fees charged by these pathologists, radiologists, and cardiologists are a part of the "costs of the hospital," the term being used here in the sense of cost of operation of a hospital. On the other hand, we do not

rule out the possibility that at the time of the enactment of this statute the words "total costs of the hospital" might have been a term "of art" in the health care field having a well understood meaning different from its common signification which would include the fees of the physicians here. Therefore, we think that the cause of justice would be best served by a remand of this case to the Circuit Court for Montgomery County under Maryland Rule 871 without affirmance or reversal for further proceedings in which the Commission would be afforded an opportunity to present evidence of such an understanding of the meaning of the term within the field of health care at the time this statute was enacted, if such testimony in fact is available. In order that there may be no misunderstanding, we point out that if the services here under consideration were not understood in the health care field as embraced within "total costs of the hospital" at the time of the enactment of this statute, the Commission has exceeded the power vested in it by the General Assembly. [*Id.* at 689-90.]

On the remand the trial judge heard about nine days of testimony and considered numerous exhibits. He issued a comprehensive opinion in which he concluded in part:

2. The words "total costs of the hospital" as contained in the statute enacted in 1971 (Art. 43, § 568 U (a), Ann. Code of Md. 1957 Ed., 1980 Replacement Volume) constitute a term of art which at that time had a well understood meaning within the field of health care different from its common significance, and as such, included the professional fees of hospital based radiologists and pathologists.

He went on, however, to direct the Commission:

[T]o exclude from their cost review determination with respect to Holy Cross Hospital, the professional fees of those radiologists, pathologists and

electrocardiologist which are billed to the patients directly by the physicians in question . . . and are not carried as allowable costs on reports or the audited financial statement of the hospital for purposes of reimbursement by third-party payors, or for hospital accounting purposes . . . .

The Commission appealed to the Court of Special Appeals. Prior to hearing in that court the Commission petitioned us for the writ of certiorari. Notwithstanding the provision of Maryland Rule 811 a 3 (d) that a petition for that writ shall contain "[t]he questions presented for review," the Commission framed no question in its petition. It did "contend[ ] that since the Circuit Court concluded that 'total costs of the hospital' was a term of art in the health care field at the time the Commission's statute was enacted which term included the fees of hospital-based radiologists and pathologists, it was error to conclude further that the direct billing of such fees would escape Commission jurisdiction." It further "contend[ed] that based on the finding of the Circuit Court, the Commission does have the jurisdiction to regulate the fees charged by hospital-based radiologists, pathologists and electrocardiologists to hospital patients, no matter how billed." The answer to the petition stated that if we determined to issue the writ "the Physician Respondents w[ould] demonstrate that the Circuit Court did not err, as suggested by the Commission, in finding that the fees of the Physician Respondents were not subject to the Commission's jurisdiction, but rather in finding that the words 'total costs of the hospital' as contained in the Commission's enabling statute was a term of art having a well understood meaning."

In this Court the Commission claims that "[h]aving determined that 'total costs of the hospital' are subject to Commission jurisdiction, including the professional fees of hospital-based radiologists and pathologists, the lower court erred by concluding that these physicians could escape Commission jurisdiction by contracting with the hospital as to the manner of billing." Holy Cross and the physicians contend that "[t]he circuit court erred in concluding that the

statutory phrase 'total costs of the hospital' was a term of art in Maryland in 1971."

The Commission moved to strike that portion of the brief of Holy Cross and the physicians which deals with the latter point. Rule 813 b (1) is applicable. It states:

> In cases pending in the Court of Special Appeals where no decision has been rendered by it, if the original petition for certiorari is filed by the appellant, this Court will ordinarily consider only the issues which have been raised in the petition and any cross petition and which have been preserved for appellate review, unless otherwise provided by the order granting the writ of certiorari.

This rule was extensively discussed in *Offutt v. Montgomery Co. Bd. of Ed.,* 285 Md. 557, 563-64, 404 A.2d 281 (1979), *Robeson v. State,* 285 Md. 498, 501-04, 403 A.2d 1221 (1979), and *State v. Raithel,* 285 Md. 478, 482, 404 A.2d 264 (1979). We consider the contention of the Hospital and the physicians here to have been embraced within that portion of the Commission's petition which claimed "that based on the finding of the Circuit Court, the Commission does have the jurisdiction to regulate the fees charged by hospital-based radiologists, pathologists and electrocardiologists to hospital patients, *no matter how billed."* (Emphasis added.) Moreover, as long as there is compliance with Rule 813 a, an appellee, without taking a cross-appeal, is entitled to argue as a ground for affirmance of a trial court judgment a matter that was resolved against the appellee at trial. *Offutt* n. 4 at 564, *St. Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 123, n. 2, 360 A.2d 1 (1976), and *Capron v. Mandel,* 250 Md. 255, 259, 241 A.2d 892 (1968). Hence, the motion to strike certain portions of the brief is denied.

Since in our view the trial court erred in determining that the statutory phrase "total costs of the hospital" was a term of art in Maryland in 1971, we need not address the Commission's contention that the trial judged erred by directing the Commission "to exclude from their cost review determination with respect to Holy Cross Hospital, the professional

fees of those radiologists, pathologists and electrocardiologist which are billed to the patients directly by the physicians in question ... and are not carried as allowable costs on reports or the audited financial statement of the hospital for purposes of reimbursement by third-party payors, or for hospital accounting purposes ...."

The term "words of art" is defined in Black's Law Dictionary 1439 (5th ed. 1979) as:

> The vocabulary or terminology of a particular art or science, and especially those expressions which are idiomatic or peculiar to it.

Further light is shed by 2A *Sutherland, Statutory Construction* § 47.31 (4th ed. C. Sands, 1973) which states:

> Although questions of statutory interpretation are questions of law which are decided by the judge instead of a jury and concerning which a court is not bound by the testimony of witnesses, the trade or commercial meaning of a term is treated as a fact to be proved in each case. Until such fact is proved, an alleged commercial or trade meaning of a common term is presumed to be the same as the common meaning. Futhermore, in order that an alleged trade or commerical meaning of a term shall prevail, it must appear that such commercial meaning is the result of established usage in commerce and trade, and that, at the time of the passage of the act, such usage was definite, uniform, and general, and not partial, local, or personal. There is no presumption that the trade or commercial meaning once established, continues. [*Id.* at 156.]

An example of a word as a term of art is found in an earlier generation when the word "telephone" had only recently appeared on the American scene and it was held in *Hockett v. State,* 105 Ind. 250, 263, 5 N.E. 178 (1886), to be one of art.

On the remand the Commission presented *no* evidence that the term "total costs of the hospital" was one of art. It

did produce numerous witnesses to testify that the phrase "total costs of hospital services" was a term of art.[2] At a pretrial conference counsel for Holy Cross and the physicians suggested the proper question to be decided but the Commission succeeded in persuading the trial judge to the contrary. Later in the trial, however, he did correctly focus on the issue, stating, "I am dealing with a very narrow issue which has been sent back to me by the Court of Appeals and it revolves around this concept of *cost of the hospital* and not the philosophical decisions as between a physician and someone else." (Emphasis added.)

Numerous witnesses produced by Holy Cross and the physicians testified that the term "total costs of the hospital" was not a word of art within the health care field at the time the statute was enacted.

As previously indicated, in *Holy Cross* I we pointed out that since the term " 'total costs of the hospital' means the Hospital's expenditures or outlays of money in connection with the operation of the Hospital," the Commission exceeded its power in attempting to control the fees or charges here and there involved *unless* "the words 'total costs of the hospital' might have been a term 'of art' in the health care field having a well understood meaning different from its common signification which would include the fees of the physicians here." It was for that reason and that reason only that in the interest of justice we invoked Maryland Rule 871 and remanded the case to the trial court without affirmance or reversal in order that the Commission

---

2. The concluding portion of the opinion as originally filed in *Holy Cross* I referred to "total costs of hospital services" rather than to "total costs of the hospital," the term appearing in the statute and which appeared elsewhere in the opinion. The error was detected and sixteen days after filing of the opinion, which was prior to the issuance of the mandate, correction slips were issued.

In *Holy Cross* II the assistant Attorney General who tried this case on the remand and who argued *Holy Cross* I appeared on behalf of the Commission. The Court quoted, 285 Md. at 386, from the corrected version of *Holy Cross* I. As previously indicated, *Holy Cross* II concerned the attempt of Maryland Radiological Society and others to intervene after our remand in *Holy Cross* I. It was decided prior to the trial of the issues now before us. Thus, there is no reason for the Commission to have been misled in any way as to the terms of the remand.

might be afforded an opportunity to present evidence of such an understanding of the meaning of the term within the health care field at the time the statute was enacted "if such testimony in fact is available." To avoid any possible misunderstanding we then went on to indicate that *unless* such fact were proven "the Commission has exceeded the power vested in it by the General Assembly." It follows that under the terms of the remand that the extensive testimony adduced about "total costs of hospital services" as a term of art, various federal statutes concerning health care, methods used relative to reimbursement by insurers, the understanding by some people in the health care field of what the statute was intended to mean and the like were irrelevant and immaterial to the issues before the trial court.

Since the Commission failed to prove that the words "total costs of the hospital" were a term of art so as to cause them to have a meaning in the statute different from the common, ordinary signification of the term, it follows that the Health Services Cost Review Commission exceeded its authority in the case at bar and its order must be reversed.[3]

---

3. Cognizance is taken of the dissent. We shall not prolong this opinion by writing a rebuttal to each and every proposition advanced by the dissent. We make but two comments.

The dissent would lead one to believe that it was not until "7 January 1980, [that] the Commission, at long last, became aware of the existence and full impact of the corrected opinion." We have already pointed out in the text of this opinion, "At a pretrial conference counsel for Holy Cross and the physicians suggested the proper question to be decided but the Commission succeeded in persuading the trial judge to the contrary:" As a matter of fact, the attorney for one of the intervening physicians called to the attention of the trial judge at that time that the word "services" was not in the statute in question and that this was the reason for the correction. The assistant Attorney General who was present representing the Commission acknowledged his cognizance of the corrected version which had been quoted in *Holy Cross II.* Had anyone been willing to pull from the shelf the appropriate volume of the *Maryland Reports* or the *Atlantic Reporter* the opinion in its proper form would have readily appeared, even had one looked at an "advance sheet." This conference took place on October 5, 1979. The dissent quotes, adding emphasis, the statement of the trial judge on December 18, 1979, to the effect that he did not know by which opinion he was bound, the published, corrected opinion or the original one. Why, may one ask, would the Court have distributed corrected versions of the opinion if it were not that this corrected version was to bind the parties? Indeed, just what does the word "correction" mean? In common parlance the issuance of the correction slip would mean that the Court had detected an error.

The General Assembly is presumed to be fully familiar with the holdings of this Court. *Bingman v. State,* 285 Md. 59, 65, 400 A.2d 765 (1979), and cases there cited. There have been two sessions of the General Assembly since our opinion was filed in *Holy Cross I.* Nevertheless, the General Assembly has not seen fit to change the statute. If it intends a different interpretation, it no doubt will say so by amending the law relative to the Commission's powers.

> *Judgment reversing the order of the Health Services Cost Review Commission modified to eliminate so much thereof as approved the Commission's regulation of the charges here before the Court, and, as modified, judgment affirmed; appellant to pay the costs.*

*Davidson, J., dissenting:*

## I

### Procedural History

Before discussing the merits of this case, it is necessary to review its unfortunate procedural history that resulted in a deficient record that, in my view, has severely prejudiced the outcome. In *Holy Cross Hospital of Silver Spring, Inc. v. Health Services Cost Review Commission,* 283 Md. 677, 393 A.2d 181 (1978) (*Holy Cross I*), the question presented was whether the Health Services Cost Review Commission (Commission) had the authority to regulate the costs of services of pathologists, radiologists, and cardiologists (hospital-based physicians)[1] at Holy Cross Hospital (Hospital).

---

Despite the purpose of the remand the Commission simply elected to question its experts relative to "total cost of hospital services" as a term of art in the health care field, not "total costs of the hospital."

1. Throughout this dissenting opinion, the term "hospital-based physicians" means pathologists, radiologists, or cardiologists — physicians who

The evidence showed that these hospital-based physicians had a contract with the Hospital under which they were compensated on a fee-for-service basis with the Hospital billing the patients for the costs of their services, collecting payment from the patients, and then reimbursing the hospital-based physicians. The trial court held that the Commission had the authority to regulate the costs of services of hospital-based physicians when the hospital billed the patient.

The Court of Appeals disagreed. Focusing on the question whether the costs of services of hospital-based physicians were part of the "total costs of the hospital," it held that the Commission had no authority to regulate the costs of these services because they were not part of the "total costs of the hospital," a term that this Court defined as "the Hospital's expenditures of money in connection with the operation of the Hospital." *Holy Cross I,* 283 Md. at 689, 393 A.2d at 187. In an opinion filed 6 November 1978 (original opinion), this Court further stated:

> "[W]e do not rule out the possibility that at the time of the enactment of this statute the words *'total costs of hospital services'* might have been a term 'of art' in the health care field having a well understood meaning different from its common signification which would include the fees of the physicians here. Therefore, we think that the cause of justice would be best served by a remand of this case to the Circuit Court ... for further proceedings in which the Commission would be afforded an opportunity to present evidence of such an understanding of the meaning of the term within the field of health care at the time this statute was enacted, if such testimony in fact is available." [Slip op. at 12 (emphasis added).]

---

generally provide in-patient hospital services and generally are hospital-based.

In a correction filed 16 days later on 22 November 1978 (corrected opinion), the term "total costs of the hospital" was substituted for the term "total costs of hospital services."

On 5 October 1979, a pretrial conference was held in order to define the issue and narrow the scope of the evidence to be admitted at trial. Despite the fact that by this time it should have been patently clear that the question presented was whether the term "total costs of the hospital" was a term of art, by some vagary neither the parties nor the trial court understood the full impact of the corrected opinion. The Hospital contended that the question presented was whether the term "total costs of the hospital" was a term of art. However, it did not rely upon the language of the corrected opinion. Instead, it relied upon the fact that in a quotation from *Holy Cross I* that appears in *Maryland Radiological Society, Inc. v. Health Services Cost Review Commission*, 285 Md. 383, 389, 402 A.2d 907, 909 (1979) *(Holy Cross II)*, the term "total costs of the hospital" was substituted for the term "total costs of hospital services." The Commission argued that the correct term was "total costs of hospital services," which appeared in the original opinion.

The trial court refused to limit the issue to the question whether the term "total costs of the hospital" was a term of art. It stated:

> "I am going to listen to any witness that either of you want to produce, within reason. Now, if I don't agree with your definition of the issue, I am still going to listen to the witness . . . I am not making any ruling at all today. . . . *This matter is a matter of extreme importance* . . . and if you think I am not going to listen to everything on this matter with that kind of an issue involved, you better have another think coming." (Emphasis added.)

After a final attempt by the Hospital "to persuade [the trial court] to follow the Court of Appeals' language," the trial court responded, "If I knew what they meant, I might follow it."

On 8 October 1979, the trial on the merits began. Apparently still unaware of the corrected opinion, the Commission presented extensive testimony to prove that the term "total costs of hospital services" was a term of art. This evidence included detailed testimony as to the established usage and general practices concerning the costs of hospital-based physicians' services in the health care field in 1971. On 11 October 1979, the Commission rested its case.

The Hospital moved for a directed verdict. The Hospital, quoting from the original opinion, pointed out that the Commission had been required to show that the term "total costs of hospital services" was a term of art. It argued that the Commission had failed to carry its burden of proof on this issue. The trial court denied the motion. Thus, at the time the Commission rested, the parties and the trial court were still unaware of the impact of the corrected opinion.

On 18 December 1979, when the trial resumed, the Hospital indicated to the trial court that it had become aware of the existence and full impact of the corrected opinion because a "clerk doing some research in connection with this case ... came upon the reported [corrected] decision...." The trial court stated that subsequent to the issuance of the original opinion, it had received corrections but that it had not been aware that the term "total costs of the hospital" had been substituted for the term "total costs of hospital services." The trial court then said:

> "The only thing that I can suggest to you to do is to take it up with the Court of Appeals because I am bound by — well, *I don't know which I am bound by, actually, either the published* [the corrected opinion] *or this one* [the original opinion].
>
> . . .
>
> I suggest that you gentlemen confer with the Court of Appeals and find out what they meant.
>
> *Now I am going to proceed on the assumption that we have been trying this case on right along,* and we will continue on that assumption and if it

gets changed, well, it gets changed. But you might point out when you do refer this matter to the Court of Appeals that *we have four days of trial on the assumption that the word 'services' is in the opinion.*" (Emphasis added.)

Thus, as late as 18 December 1979, although the trial court knew of the existence of the corrected opinion, it was still unaware of its impact.

The hospital proceeded to present its case. It presented evidence to show that neither the term "total costs of hospital services" nor "total costs of the hospital" was a term of art. It argued that physicians' services and hospital services were different; that a physician service could never be a hospital service; and that the costs of hospital services were part of the total costs of the hospital but that the costs of physicians' services were not. It contended that nonsalaried hospital-based physicians performed physicians' services, not hospital services, and, consequently, that the costs of nonsalaried hospital-based physicians' services were not a part of either the "total costs of hospital services" or the "total costs of the hospital." However, while the Hospital insisted that salaried hospital-based physicians also performed physician services, not hospital services, it, nonetheless, conceded that the costs of salaried hospital-based physicians' services were a part of the total costs of the hospital. The only reasons offered to explain this illogical conclusion were that a physician service could never be a hospital service and, therefore, a part of the total costs of the hospital because "a hospital certainly cannot practice medicine" but that, nevertheless, the costs of salaried hospital-based physicians' services were part of the total costs of the hospital because such hospital-based physicians are "on the payroll."

On 7 January 1980, during the Hospital's presentation, the trial court indicated that it had received clarification of the issue from the Clerk of the Court of Appeals, who told it that the corrected opinion was "the accurate one." Thereafter, the trial court stated:

"[T]he phrase which is to be used is 'cost of the hospital' not 'cost of hospital services' *which is a little bit different from what we all thought for a while.* And, what the effect of this may be on the outcome, I have no way of knowing at this time." (Emphasis added.)

Thus, on 7 January 1980, the Commission, at long last, became aware of the existence and full impact of the corrected opinion. As a result of the trial court's ruling, the Commission understood for the first time that it had been required to show that the term "total costs of the hospital," and not the term "total costs of hospital services," was a term of art.

On 22 January 1980, the Commission presented rebuttal evidence. It began a line of questioning that, in my view, was designed to elicit an opinion from an expert as to whether the term "total costs of the hospital" was a term of art that included the costs of services of hospital-based physicians. The following colloquy took place:

"Q. [COUNSEL FOR COMMISSION]: [D]o you have an opinion as to whether or not the term 'total cost of the hospital' includes radiologists and · pathologists who are hospital-based physicians?

[COUNSEL FOR HOSPITAL]: Objection, Your Honor.

THE COURT: That will be sustained. That is not rebuttal. You should have brought him in the principal case if you wanted to get his opinion on it. Sustained.

[COUNSEL FOR COMMISSION]: Well, Your Honor —

THE COURT: I have sustained the objection. All right, go ahead."

Thus, the trial court, which had steadfastly refused to rule that the question presented was whether the term "total costs of the hospital" was a term of art until after the Com-

mission had presented its entire case, prevented the Commission from offering evidence on that critical issue during rebuttal. As a result, despite the trial court's awareness that because the Commission represented the public interest, this case was a "matter of extreme importance," it, nonetheless, caused an unfortunate deficiency in the record that, in my view, has severely prejudiced the outcome of this case.

Notwithstanding the deficiency of the record in this respect, the trial court found, based upon evidence of established usage and general practices in the health care field in 1971, that the term "total costs of the hospital" was a term of art with respect to the costs of services of hospital-based physicians. It concluded that the Commission had the authority to regulate the costs of services of hospital-based physicians when the hospital billed patients, but not when the hospital-based physicians billed patients directly.

Based upon the deficient record before it, the majority here (*Holy Cross III*) disagrees. It finds that there is "*no* evidence that the term 'total costs of the hospital' was one of art" (emphasis in original) and, therefore, that the Commission lacks the authority to regulate the costs of hospital-based physicians' services whether billed by the hospital or by the hospital-based physicians.

Even if I agreed with the majority that there was "*no* evidence that the term 'total costs of the hospital' was one of art" (emphasis in original), I would not, on the basis of the deficient record here, conclude that the Commission lacks the authority to regulate such costs. I would instead remand the case to the trial court for further proceedings to afford the Commission the opportunity that was denied by the trial court during the trial on remand from *Holy Cross I* to present evidence of the understanding of the meaning of the term "total costs of the hospital" in the health care field in 1971.

However, despite the deficient record, I, unlike the majority, agree with the trial court that there was sufficient evidence to show that the term "total costs of the hospital" was

a term of art. I disagree with the trial court that the Commission lacks the authority to regulate the costs of services of hospital-based physicians who bill patients directly. In my view, the term "total costs of the hospital" included the costs of services of all hospital-based physicians whether billed by the hospital or by the hospital-based physicians. Accordingly, I respectfully dissent.

## II

### The Merits

Maryland Code (1957, 1980 Repl. Vol.), Art. 43, § 568H, effective 1 July 1971, provides in pertinent part:

> "In creating the Health Services Cost Review Commission, the intent of the Maryland General Assembly shall be as follows:
>
> . . .
>
> (2) From and after July 1, 1974, an additional responsibility of this Commission is to *assure all purchasers of health care hospital services that the total costs of the hospital are reasonably related to the total services offered by the hospital;* that the hospital's aggregate rates are set in reasonable relationship to the hospital's aggregate costs; and that rates are set equitably among all purchasers of services without due discrimination." (Emphasis added.)

Section 568U (b) provides in pertinent part:

> "(b) In order to properly discharge these obligations, the Commission shall have full power to review and approve the reasonableness of rates established or requested by any hospital subject to the provisions of this subtitle."

This Court has recognized that the Commission was created for the purpose of protecting patients by "assuring the rea-

sonableness of rates set by hospitals." *Health Servs. Cost Review Comm'n v. Franklin Square Hosp.,* 280 Md. 233, 234-35, 372 A.2d 1051, 1052 (1977). More particularly, this Court has stated that "the provisions of the Act reflect the legislative intent that the Commission have broad authority over the financial affairs of hospitals," in order to effectuate the Act's purpose of protecting patients by "insur[ing] that rates charged to patients reflect fairly the cost of care provided the patients." *Blue Cross of Md., Inc. v. Franklin Square Hosp.,* 277 Md. 93, 109, 111, 352 A.2d 798, 808, 809 (1976).

Although this Act, because of its broad remedial purpose, should be liberally construed, *Keeling v. State,* 288 Md. 579, 589, 420 A.2d 261, 266 (1980); *James v. Prince George's County, Md.,* 288 Md. 315, 335, 418 A.2d 1173, 1184 (1980); 3 Sutherland, Statutory Construction § 60.01-02 (4th ed. C. Sands 1974), the majority here uses a narrow, rigid, and formalistic approach in interpreting the term "total costs of the hospital." Initially, it determines that the terms "total costs of hospital services" and "total costs of the hospital" were not interrelated and were different in meaning. It then concedes that the Commission produced "numerous witnesses to testify that the phrase 'total cost of hospital services' was a term of art." However, it determines that the term "total costs of the hospital" was not a term of art because "the Commission presented *no* evidence that the term 'total costs of the hospital" was one of art." (Emphasis in original.)

Throughout this litigation the phrase "term of art" has been defined in various ways. Initially, in *Holy Cross I,* 283 Md. at 689-90, 393 A.2d at 187, this Court stated "that at the time of the enactment of this statute the words 'total costs of the hospital' might have been a term 'of art' in the health care field having a *well understood meaning different from its common signification"* which the Court defined as *"the Hospital's expenditures or outlays of money* in connection with the operation of the Hospital." (Emphasis added.) The Court remanded the case to the Circuit Court to afford the Commission

"an opportunity to present evidence of such an understanding of the meaning of the term within the field of health care at the time this statute was enacted. . . ."

Finally, this Court said:

"In order that there may be no misunderstanding, we point out that if the services here under consideration *were not understood in the health care field* as embraced within 'total costs of the hospital' at the time of the enactment of this statute, the Commission has exceeded the power vested in it by the General Assembly." (Emphasis added.)

Thus, *Holy Cross I* establishes that on remand the Commission was to adduce evidence to show what professionals in the health care field generally understood the term "total costs of the hospital" to have meant in 1971, the time of the enactment of the statute. The Commission was not required to adduce evidence comprised of explicit, conclusionary statements by such professionals, whose training and experience do not necessarily qualify them to draw a conclusion whether the term "total costs of the hospital" constituted a term of art.

On remand, the Hospital, when questioning various witnesses, repeatedly defined the phrase "term of art" as

"a word or phrase which has a particular meaning within a given industry or profession which it would not have to the ordinary person not a member of that industry or profession."

Thus, the Hospital also recognized that conclusionary statements that the term "total costs of the hospital" was a term of art were insufficient and that it was necessary to adduce evidence to show what professionals in the health care field understood that term to mean in 1971.

Finally, in *Holy Cross III,* the majority, in defining the phrase "term of art," quotes from Black's Law Dictionary and from 2A Sutherland, Statutory Construction § 47.31 (4th ed. C. Sands, 1973), the latter of which states:

"[I]n order that an alleged trade or commercial meaning of a term shall prevail, it must appear that such commercial meaning is the result of *established usage* in commerce and trade, and that, at the time of the passage of the act, such usage was definite, uniform, and general, and not partial, local, or personal." (Emphasis added.)

Thus, the majority recognizes that in order to establish that the term "total costs of the hospital" was a term of art, the Commission was required to show the "established usage" or, in other words, the general practices that existed in the health care field at the time of the enactment of the statute. Such evidence, rather than some ritualized litany, would have demonstrated what professionals in the health care field understood the term to mean. Nevertheless, the majority fails to take into account any of the extensive evidence presented to show the established usage and general practices that existed in the health care field in 1971.

I disagree with the majority that the terms "total costs of hospital services" and "total costs of the hospital" were not interrelated and had different meanings. There is uncontradicted evidence to show that all "costs of hospital services" were part of the "total costs of the hospital." [2]

---

**2.** *See, e.g.,* the testimony of a health care educator, Dr. Roemer, who stated as follows:

"Q. . . . Do you think that in the health care field in 1970 and '71 the *total costs of hospital services* would have meant to people in the health care field what is included on the *hospital costs* in those national accounts?

A. In the statistical presentations that I'm familiar with, yes, that I would say the health care field in general uses, *yes.* Including the — including *publications* by the American Medical Association." (Emphasis added.)

*See also* the testimony of a hospital administrator, Dr. Ebert, who stated that in 1970-71 *"hospital services were part of hospital costs."* (Emphasis added.)

Indeed, the hospital-based physicians conceded that hospital services were part of the total costs of the hospital. *See, e.g.,* the testimony of a pathologist, Dr. Palmer, who defined *"hospital cost"* as *"the costs that are incurred by a patient for . . . hospital services"* and agreed that *"anything that would be a hospital service, the cost of that service would be a hospital cost."* (Emphasis added.)

Therefore, I would take into account all the evidence produced by the "numerous witnesses" who testified "that the phrase 'total costs of hospital services' was a term of art."

In addition, I do not agree with the majority's finding that there is "*no* evidence that the term 'total costs of the hospital' was one of art." (Emphasis in original.) The record shows that there was at least one witness who made an explicit, conclusionary statement that the term was a term of art [3] and another whose testimony inferentially supports that conclusion.[4] Finally, the record abounds with evidence that shows the established usage and general practices in the health care field in 1971, and, therefore, the understanding of professionals in that field at that time. All of this evidence is more than sufficient to show that the term "total costs of the hospital" was a term of art.

---

3. A hospital cost analysis expert, Mr. Holmes, testified as follows:

"Q. ... *Total cost of hospital services, I believe you said is a term of art?*

A. *I believe when we were talking about total hospital cost* at the time that question was asked.

Q. No, I believe the term you were asked, sir, I wrote it down, I could be wrong. But, I believe the term you were asked, sir, was in 1971, the term, total cost of hospital services a term of art?

A. *Either way, I believe you could say it was a term of art.*" (Emphasis added.)

4. A hospital administrator, Dr. Ebert, testified as follows:

"Q. ... Let me ask you whether or not in 1971 or traditionally thereto, *there was a term of art* in the health care field, 1971, *which was* known as '*the total cost of hospital services*'?

A. *Yes. ...*"

Q. Does it make any difference to you, Doctor, whether we are talking about *the term of art 'total cost of the hospital' or 'total cost of the hospital services'* ?

A. Well, I would assume that the *total cost of hospital services would refer to* the particular services that we are discussing here including *pathology, radiology and the like;* and that the *total hospital cost would include everything* including the amortization.

THE COURT: Which term is included within the other?

. . .

THE WITNESS: Well, I would — I am not an expert in this. *I would have included the hospital services, the total cost of hospital services under the total hospital's cost,* but again that's my definition.

Distinguished physicians, hospital administrators, health care educators, third party payors, hospital cost analysis experts, and accountants testified as to established usage and general practices in the health care field in 1971.[5] They initially pointed out that the relationship of hospital-based physicians to hospitals was unlike that of other members of the medical profession. The services of hospital-based physicians had historically and consistently been required in order for a hospital to be accredited and licensed. Hospital-based physicians generally practiced under a contractual arrangement with the hospital that, in essence, created a monopoly. Ordinarily, all hospital patients received the services of hospital-based physicians.

As a result of these differences, hospitals had traditionally and consistently compensated hospital-based physicians differently from other physicians. Throughout the 1960s, hospital-based physicians were compensated by either a salary, a percentage of the gross or net departmental revenue, or a fee-for-service.[6] Most hospitals traditionally billed patients for the costs of services of both salaried and

---

. . .

Q. So, in other words, in your opinion, the cost of the hospital is inclusive of whatever meaning you would give to total cost of hospital service?
A. Correct." (Emphasis added.)

Subsequently, Dr. Ebert stated that in Massachusetts in 1970-71 it was

"the common understanding of the people in the profession interested in hospital costs, it would have been *hospital services were part of hospital costs.*" (Emphasis added.)

5. The Commission presented 15 witnesses, including physicians, a variety of other health care professionals, accountants, and government officials. None of the physicians were associated with Holy Cross Hospital, and none were pathologists, radiologists, or cardiologists. The qualifications of the experts here quoted are described in APPENDIX A to this dissenting opinion.

6. A study entitled *Hospital-Based Specialists Study: Pathologists and Radiologists Arrangements with Hospitals 1965-1968,* supervised by a health care educator, Professor Van Dyke, showed that in 1968 approximately one-third of the hospital beds in the United States were served by pathologists compensated by a salary; approximately one-third of the beds were served by pathologists who were compensated by a percentage of departmental revenue; and approximately one-third were served by pathologists compensated by a fee-for-service.

nonsalaried hospital-based physicians, although in a few hospitals, hospital-based physicians billed patients directly.[7]

Many of the experts testified that traditionally hospital-based physicians' services were a part of hospital services and, therefore, the costs of hospital-based physicians' services were consistently and traditionally treated as part of the total costs of the hospital.[8] More particularly, these experts further testified that traditionally the costs of hospital-based physicians' services were part of the total costs of the hospital whether the hospital-based physicians were compensated by a salary, a percentage of the departmental income, or a fee-for-service [9] and whether the hospital billed

---

7. The Van Dyke study indicated that in 1968, pathologists' pure direct billing arrangements accounted for only 7.6 percent of total hospital beds in the United States.

A study prepared for the Health Services Cost Review Commission by a third party payor, Mr. Morfe, indicated that before 1974, 40 of 42 Maryland hospitals surveyed billed patients for pathologists' services.

8. A hospital administrator, Dr. Ebert, testified as follows:

"Q. Now, who in your experience traditionally billed patients for radiological and pathological services?

A. Traditionally, *the hospital billed* or, really, it was absorbed into the bill into the rate of the hospital *as part of the hospital cost.*" (Emphasis added.)

A health care educator, Dr. Roemer, testified as follows:

"There was no doubt in the health care field as I understood it and I would say as it was generally understood by the vast majority of personnel in that field. I don't say 100 percent by any means but the vast majority of people in that field shall — I say particularly those concerned with the provision of health services to the population and I cannot help but be influenced by my own background in this interpretation which is public health and social medicine, a field which is concerned with the welfare of the population as a whole. In this field *the services of radiologists and pathologists in hospitals* being implemented *in the vast majority of cases* by some contractual relationship between these specialists and the hospital *were regarded as hospital services* and *the costs which were met* ultimately *by the patient* or an agency on his behalf such as insurance plan *were hospital costs.*" (Emphasis added.)

9. A hospital administrator, Dr. Nelson, testified as follows:

"Q. In your experience, sir, *radiology and pathology were also costs of the hospital,* is that correct?

A. That is *correct.*

Q. Because they were salaried individuals at your hospitals?

the patients for the services or the hospital-based physicians billed the patients directly.[10]

There was other evidence to show that as a matter of established usage and general practices, the costs of hospital-based physicians' services were a part of the total costs of the hospital. Statistical data and studies established that hospitals traditionally billed patients for the costs of services of both salaried and nonsalaried hospital-based physicians [11] and treated the costs of those services as part of the total costs of the hospital.[12] Accounting standards estab-

A. They were under contractual relationships, *some of which were salaried* and many of which were on some *percentage of the gross or the net,* as you mentioned earlier.

Q. If in fact they were on a separate *fee-for-fee service* independent billing arrangement, would they have been a cost of the hospital then, sir?

A. I would have considereded it, *yes,* because it's part of the hospital, the total cost of hospital services." (Emphasis added.)

10. A hospital administrator, Mr. Derzon, testified as follows:

"Q. . . . Now, would a radiologist be included within that phrase, costs of hospital?

A. Yes.

Q. What *if that radiologist billed independently, that made no difference* to you, did it, in your testimony?

A. *No,* not really." (Emphasis added.)

A hospital administrator, Dr. Nelson, testified as follows:

"Q. If in fact they were on a separate *fee-for-service independent billing arrangement,* would they have been a *cost of the hospital* then, sir?

A. I would have considered it, *yes,* because it's part of the hospital, the total cost of hospital services." (Emphasis added.)

A third party payor, Mr. Morfe, testified as follows:

"THE COURT: . . . Even under your definition [of hospital costs], *you would not include the cost of the radiologist and pathologist who billed a patient directly* for their services?

THE WITNESS: *In 1971,* under my definition, *you would, because traditionally the majority of all hospitals —*

THE COURT: I understand that." (Emphasis added.)

11. As stated in n.7, the Van Dyke study indicated that in 1968, pathologists' pure direct billing arrangements accounted for only 7.6 percent of total hospital beds in the United States. Additionally, the Morfe study indicated that before 1974, 40 of 42 Maryland hospitals surveyed billed patients for pathologists' services.

12. *See, e.g., Schedule Showing Arrangements with Anesthesiologists, Pathologists, Radiologists, and Other Payments to Doctors, Interns, and*

lished by the American Association of Hospitals indicated that the costs of services of both salaried and nonsalaried hospital-based physicians should be treated as part of the total costs of the hospital.[13]

In addition, third party payors traditionally included the costs of hospital-based physicians' services as part of the total costs of the hospital. Thus, Blue Cross, which reimbursed only for hospital costs, and not for the costs of physicians' services, took the costs of services of salaried and nonsalaried hospital-based physicians into account in determining its premium rates [14] and until 1972, paid the costs of such services [15] whether billed by the hospital or by

---

*Residents for all General Hospitals,* a study supervised by a hospital cost analysis expert, Mr. Holmes. That study showed that in 1963 the costs of services of salaried and nonsalaried hospital-based physicians were included as part of the total costs of the hospital in the cost reports of virtually every hospital in the State of Maryland.

*See also Report of the State of Maryland Commission to Study Hospital Costs* (Gruehn Report 1964), the study of Maryland's rising hospital costs that was the genesis of Art. 43, § 568H-Z. That report stated in pertinent part:

"The financial arrangements by which [hospital-based physicians'] services are made available to the patient, or to the admiting physician, represent a major segment of hospital costs."

**13.** *See, e.g.,* American Hospital Ass'n, *Uniform Chart of Accounts and Definitions for Hospitals* (1959); American Hospital Ass'n, *Cost Finding for Hospitals* (1957); and American Hospital Ass'n, *Chart of Accounts for Hospitals.*

**14.** *See, e.g.,* the testimony of Mr. Morfe, a third party payor, who stated as follows:

"Blue Cross did through 1971 include in its premiums, I should say or subscribers dues, the cost of hospital-based physicians for radiology, pathology for in-patient services."

**15.** *See, e.g.,* the testimony of a hospital administrator, Mr. Owen, who stated as follows:

"The Blue Cross plan would then contract with each hospital after the elements had been negotiated. Each year we go through a negotiation session in which we include some costs and some would be thrown out. *Radiology, pathology,* contractual services such as that *were always included as part of that cost* which was negotiated at the time." (Emphasis added.)

*See also* the testimony of a third party payor, Mr. Morfe, who stated in response to a question concerning the impact, if any, of the method of compensation for hospital-based physicians' services:

"[W]hat would happen is that if you had a radiologist in the hospital and he was on a salary, the *radiologist's compensation for*

the hospital-based physicians.[16]

The United States Congress recognized that in the late 1960's the established usage and general practices in the health care field were to treat the costs of services of salaried or nonsalaried hospital-based physicians as part of the total costs of the hospital. Before the enactment of the Social Security Act of 1965 (Medicare Act), Title XVIII, Pub. L. No. 89-97, 79 Stat. 286 (codified in scattered sections of 26, 42 & 45 U.S.C. (1976)), the costs of services of hospital-based physicians were reimbursed by insurers of the payment of the costs of the hospital (such as Blue Cross), whereas the costs of services of all other physicians were reimbursed by

---

*salary would go into* the classification of *the Blue Cross cost report* as an expense for a physician. And the hospital would, that dollar would be included in the total. If he were on *percentage gross* or a *percentage net*, whatever that dollar amount was, it *would still go on in there.* We were not concerned as to what the method of remunerations were to the physician for radiology or pathology." (Emphasis added.)

16. *See, e.g.,* the testimony of a third party payor, Mr. Morfe, who stated that the costs of services of hospital-based physicians who billed patients directly were not part of the total costs of the hospital, and, therefore, were not reimbursable by Blue Cross. However, he further testified that because Blue Cross had traditionally collected premiums for and reimbursed for the costs of hospital-based physicians' services, Blue Cross continued until 1972 to pay Blue Shield for the costs of the services of hospital-based physicians who billed directly. More particularly, he stated:

"In other words, *when a physician billed directly* in the early years up through 1971, at the end of the year *Blue Cross had to pay Blue Shield* for those hospital-based physicians that were specifically only radiologists and pathologists *because it was considered a hospital service in 1971.*" (Emphasis added.)

*See also* a report entitled *Financial Statements and Supplemental Schedules for the Year Ended December 31, 1971 and Accountants' Report,* prepared by Haskins & Sells, Certified Public Accountants, for Maryland Blue Cross, Inc., which stated in pertinent part:

"*For years prior to 1969 the cost of in-patient services of pathologists and radiologists was paid by Maryland Blue Cross, Inc.,* and appropriate provision therefor was included in its rates. Commencing *in 1969 certain* hospitals began changing their agreements with these *physicians* to provide that fees for such services are to be *billed directly to Maryland Blue Shield, Inc. In 1971 an adjustment was made* to reflect an equitable allocation of subscription income applicable to the cost of in-patient services of pathologists and radiologists for the years 1969 through 1971 between Maryland Blue Cross, Inc. and Maryland Blue Shield, Inc. *As a result, Maryland Blue Cross, Inc. credited Maryland Blue Shield, Inc. with the amount of $1,114,300 ....*" (Emphasis added.)

insurers of the payment of the costs of physicians' services (such as Blue Shield). When the Medicare Act was enacted in 1965, it provided that the costs of services of hospital-based physicians, like those of all other physicians, were required to be reimbursed by insurers of the payment of the costs of physicians' services (such as Blue Shield). Because this requirement was contrary to the established usage and general practices in the health care field, confusion concerning reimbursement ensued.

In 1968, the Medicare Act was amended by the Social Security Amendments of 1968, Title XVIII, Pub. L. No. 90-248, 81 Stat. 821 (codified at 42 U.S.C. § 1395*l* (a) (1) (B) (1976)).[17] The purpose of that amendment was to conform the methods by which hospital-based physicians were reimbursed under the Act to the methods by which they were reimbursed under established usage and general practices. One result of the amendment was that, unlike the costs of services of other physicians, the costs of hospital-based physicians' services were accounted for as if they were hospital services and, therefore, part of the total costs of the hospital.[18] Thus, the costs of these services were reimbursed by

---

17. *See, e.g.,* the testimony of a hospital administrator, Mr. Derzon, for a detailed history of the development of the Social Security Amendments of 1968.

According to the Report of the Committee on Ways and Means, H.R. Rep. No. 544, 90th Cong., 1st Sess. 40 (1967), *reprinted in* [1967] U.S. Code Cong. & Ad. News 2834, 2900-01, concerning the Social Security Amendments of 1968, the purpose of the amendment was to eliminate the resulting confusion by conforming the procedures under the law to the practices existing in the health care field. That Report provides in pertinent part:

"This change would provide reimbursement for the services in question in *a manner that is comparable to the inhospital coverage of pathology and radiology procedures that is afforded by many other health benefit plans* thereby simplifying beneficiary understanding of the program and greatly facilitating medicare reimbursement by making it possible to pay for the services in question in a manner that is more consistent with the usual billing procedures of the hospital." (Emphasis added.)

18. A hospital administrator, Mr. Derzon, testified as follows:

"Q. So, the hospital [under Medicare] would or could bill its normal intermediary [the insurer of the payment of the costs of the hospital, *i.e.,* Blue Cross] for the cost of this professional service. And, we are dealing now with radiology and pathology....
A. That's correct."

insurers of the payments of the costs of the hospital (such as Blue Cross). Another result was that the costs of hospital-based physicians, like other costs of the hospital, were 100 percent reimbursable, while the costs of the services of all other physicians remained 80 percent reimbursable.[19] Such reimbursement was allowed to both salaried and nonsalaried hospital-based physicians [20] whether the hospital or the hospital-based physicians billed for the costs of their services.[21]

---

A hospital administrator, Mr. Owen, testified as follows:

"Q. How did Medicare treat physician services for — fees for physician services in pathology and radiology?

A. In 1971?

Q. Yes.

A. They treated it *just like they treated the rest of the hospital costs* as far as the hospital was concerned." (Emphasis added.)

**19.** *See, e.g.,* the testimony of a hospital administrator, Mr. Derzon, who stated as follows:

"Q. So that *radiology and pathology* in this amendment provided that they would be paid a *hundred percent,* is that correct?

A. That's correct.

. . .

Q. So, the hospital, if it put through this charge through the mechanism, would receive a hundred percent of the reasonable charge. If the *physician* put it through . . . he would *only receive 80 percent* of the charge, is that correct?

A. That's correct. . . ." (Emphasis added.)

**20.** A third party payor, Mr. Morfe, testified as follows:

"What the hospital would do [under Medicare], as an example, if it paid its radiologists a hundred thousand dollars *under whatever method, salary net or gross or whatever percent of net or gross, it would show as an expense* in the radiologist category. . . .

. . .

*It can be any method* as long as that was whatever the dollars were that were paid to the radiologist. . . ." (Emphasis added.)

**21.** A third party payor, Mr. Hess, testified as follows:

"This refers to radiologists and pathologists who are hospital-based physicians and *the same privilege or benefit was extended to radiologists and pathologists who billed directly,* so that there would be no distinction with respect to these services as to whether it was as to the method of billing." (Emphasis added.)

The Report of the Committee on Ways and Means, H.R. Rep. No. 544, 90th Cong., 1st Sess. 41 (1967), *reprinted in* [1967] U.S. Code Cong. & Ad. News at 2901, stated as follows:

Finally, statistical data and studies on health care costs, utilized and relied upon by various United States Government agencies working in the health care field, established that the costs of hospital-based physicians' services were part of the total costs of the hospital.[22]

In addition to all of the evidence adduced to show that in 1971 in the health care field the term "total costs of the hospital" included the costs of services of hospital-based phy-

---

"*Pathologists and radiologists whose billings* for their services to hospital inpatients *are independent of the hospital's billing would also benefit from the committee's amendment. Since no deductible or coinsurance would be applicable to these services,* the physician could, if he chooses to do so, submit a single bill to the program for his full reasonable charge; in such cases, the physician would not have to look to the patient for additional payment. Under the committee's bill, as under present law, *the hospital and physician would be left free to decide whether charges for the physician's services are to be billed for by the hospital or by the physician,* as well as to determine the additional elements of the parties' financial or other arrangements with each other." (Emphasis added.)

**22.** *See, e.g.,* the testimony of a health care educator, Dr. Roemer, who stated as follows:

"Q. And [the view that the costs of the services of hospital-based physicians were part of the total costs of the hospital] was the prevailing view in the health care field in 1969-1971?

A. So much so, yes, so much so that in the *national accounts issued by the United States Government* on the, as the government calls it, the medical care dollar. . . . It's often presented as a pie chart and there's a piece of the pie that's called hospital costs. There's typically either a footnote or something in the text which makes clear *that the hospital costs* in that overall spectrum of health care costs *include the costs of hospital-based physicians.*

. . .

Q. [C]an [you] cite me those authorities that so treat the health care dollar.

A. Yes. *The Department of Health, Education and Welfare. . . .* There's now a national center for health statistics which issues data on this. *The Social Security Administration* has for years in its research and statistics division issued statistical data on health care costs and to my recollection *in* my *teaching* it's commonplace . . . it's conventional to point out that that sector of health care costs in America which is called hospital services typically include the costs to the nation of hospital-based physicians.

. . .

Q. . . . Do you think that in the health care field in 1970 and '71 the total costs of hospital services would have meant to people in the health care field what is included on the hospital costs in those *national accounts?*

A. In the statistical presentations that I'm familiar with, yes, that I would say the health care field in general uses, yes. Includ-

sicians including those who billed patients directly, there was also evidence to show that at that time the well-understood meaning of the term was different from its "common signification" as "Hospital expenditures or outlays of money in connection with the operation of the Hospital." Witnesses representing a variety of health care professions testified that in 1971 in the health care field the term "total costs of the hospital" was not generally understood as being confined to the ordinary accounting notion of cost as an expense or an outlay of money.[23] Indeed, those professionals said that it was generally understood that the term "total costs of the hospital" referred to the costs traditionally and customarily paid to the hospital by patients as part of the costs of hospitalization.[24] More particularly, one witness

---

ing the — including *publications by the American Medical Association.*" (Emphasis added.)

**23.** A hospital administrator, Dr. Snoke, testified as follows:

"Q. [I]s it correct to say that any expenditure of the institution that you described is the definition of cost to the hospital?

A. I think a part of the cost of the hospital. And again, I'm — I'm sorry, I'm not trying to evade you any more than you are trying to narrow the question here. I — I'm not an accountant. *I don't look at costs as an accountant looks at it. I look at costs as an administrator* and perhaps at this stage in my career *I even look at them more as the cost to society or to the patient,* which is the same, and I can't, I'll try to stick to your narrow definition, but you just can't — I can't function that way as part of what I think is a cost of a hospital.

. . .

Q. . . . Let me ask you this, sir, what you're saying then is that cost to you as a hospital administrator means something different than costs to people in the accounting field?

A. Oh, absolutely." (Emphasis added.)

A third party payor, Mr. Morfe, testified as follows:

"Q. What are costs, Mr. Morfe?

A. . . . There are several kinds of costs. . . . And, then, the question is — really, what they are referring to here is *cost of the charges of the hospital, not the accounting costs.* . . . So I would say that *in the law you are really talking cost to whom, and the answer is cost to the purchaser, which is charges.* So, it certainly is not financial cost." (Emphasis added.)

**24.** A hospital administrator, Dr. Ebert, testified as follows:

"Q. [Y]ou suggested that you would consider [physicians'] fees as being included within the total cost of the hospital in your

specifically testified that the costs of services of hospital-based physicians who billed patients directly, while not "accounting" costs, nonetheless, traditionally were included as part of the total costs of the hospital,[25] while three others testified that the costs of services of hospital-based physicians who billed patients directly traditionally were included as part of the total costs of the hospital.[26]

---

judgment because *the patient would associate that as a cost to their hospitalization,* is that correct?

A. *Yes,* and *because customarily they had been included in the cost of hospitalization.*" (Emphasis added.)

A hospital administrator, Mr. Derzon, testified as follows:

"Q. ... Now, define for me, if you would, please, costs of hospital?

A. The *costs of hospital,* as far as I am concerned, *is the costs incurred by the patient or third party* on behalf of that patient while he is being cared for in the hospital, and *that definition would revolve heavily around the traditions in the hospital field.*

Q. Now, I understand, then, *costs of hospital are costs incurred by the patient in the hospital?*

A. *For services rendered at that hospital, right. And, with the added caveat that there is tradition to this.*

For example, the patient never expects the hospital to have a surgeon bill because the patient has generally gone to a surgeon before he came to the hospital and established a relationship, probably if he is smart, worked out a fee and comes to the hospital expecting that the hospital will not bill him for the surgical fee, but the surgeon will." (Emphasis added.)

**25.** A third party payor, Mr. Morfe, further testified as follows:

"Q. Now, if in fact the pathologist and the radiologist were on an *independent billing fee for service* ... that would not be listed as a cost of the hospital....

. . .

A. *That would not be a financial accounting cost* on a hospital's audited financial statement.

Q. Right.

A. No problem with that. *But the question is, tradition.*

. . .

THE COURT: ... *Even under your definition, you would not include the cost of the radiologist and pathologist who billed a patient directly* for their services?

THE WITNESS: *In 1971, under my definition, you would, because traditionally the majority of all hospitals —*

THE COURT: I understand that." (Emphasis added.)

**26.** *See* n.10 above.

All of this evidence overwhelmingly establishes that in 1971 in the health care field it was a virtually universal practice to include the costs of services of salaried or nonsalaried hospital-based physicians whether billed by the hospital or the hospital-based physicians as part of the total costs of the hospital. I recognize that there was some evidence to show that in the few hospitals in which hospital-based physicians billed patients directly, the costs of their services were not considered to be part of the total costs of the hospital.[27] At best, this evidence showed a relatively minor deviation from the established usage and general practices that was not sufficiently significant to support the conclusion that the term "total costs of the hospital" did not have a well-understood meaning. In my view, a term can have a well-understood meaning within a field even when there are relatively minor deviations from what is otherwise a virtually universal practice.

I further recognize that there was some evidence to show that the term "total costs of the hospital" had different meanings to different people within the health care field. When viewed in context, most of this testimony, in my view, established that some hospital-based physicians and some accountants understood that the term "total costs of the hospital" did not include the costs of services of hospital-based physicians.[28] At best, this evidence showed a relatively

---

**27.** As set forth in I Procedural History above, throughout this litigation the Hospital conceded that the costs of salaried hospital-based physicians' services were a part of the total costs of the hospital but presented some evidence to show that the costs of nonsalaried hospital-based physicians' services were not a part of the total costs of the hospital. The Hospital presented 11 witnesses including eight physicians, two accountants, and one certified hospital association executive. Six of the physicians were either pathologists or radiologists. The remaining two were a gynecologist and a family practitioner, both associated with Holy Cross Hospital. The qualifications of the experts here quoted are described in APPENDIX B to this dissenting opinion.

*See also* n.16 above.

**28.** *See, e.g.,* the testimony of a hospital administrator, Dr. Snoke, who stated as follows:

"Q. It means different things to different people?
A. Well, *it means different things to an accountant* than it does to me." (Emphasis added.)

minor deviation from the general understanding of the term that was not sufficiently significant to support the conclusion that the term "total costs of the hospital" did not have a well-understood meaning. In my view, a term can have a well-understood meaning within a field even when there are relatively minor deviations from what is otherwise a virtually uniformly accepted meaning.

Here, the established usage and general practices, as well as the uniformly accepted meaning of the term, were so extensive and pervasive and so permeated the field that there can be no question that in 1971 the term "total costs of the hospital" had a well-understood meaning within the health care field that included the costs of services of all hospital-based physicians. In addition, there was more than enough evidence to show that the well-understood meaning of the term was different from its common signification.

The record here establishes that the term "total costs of the hospital" was a term of art in the health care field in 1971. Thus, the Legislature intended the term "total costs of the hospital" to include the costs of services of salaried or nonsalaried hospital-based physicians whether billed by the hospital or by the hospital-based physicians. Such a construction is consonant "with the legislative intent that the Commission have broad authority over the financial affairs of hospitals." *Blue Cross of Md., Inc.,* 277 Md. at 109, 352 A.2d at 809. It is also consonant with the beneficent purpose of the Act which is to protect patients "by assuring the reasonableness of rates set by hospitals." *Health Servs. Cost Review Comm'n v. Franklin Square Hosp.,* 280 Md. at 234-35, 372 A.2d at 1052.

---

*See also* the testimony of a hospital administrator, Mr. Derzon, who stated as follows:

"Q. [COUNSEL FOR HOSPITAL]: I understand fully. But, if you looked at it through the eyes of or in the perception of the physicians, the understanding of that term would, of course, differ, wouldn't it, sir?

A. *With the physicians that,* apparently, *you represented, it does differ. With physicians that I dealt with, they were not uncomfortable with incorporating hospital costs.*" (Emphasis added.)

The majority's holding in *Holy Cross III* is contrary to the purpose of the Act. The majority, in essence, establishes a principle that in the absence of more than one explicit, conclusionary statement that the term "total costs of the hospital" was a term of art, overwhelming evidence of a virtually universal practice and a virtually uniformly accepted meaning is insufficient to establish that that term was a term of art. The practical result is the total deregulation of the costs of services of all hospital-based physicians, which presently represent approximately 20 percent of the total costs of the hospital. In addition, the application of this principle to other hospital-based professionals such as nurses, pharmacists, and dieticians (other hospital-based professionals) may well result in the deregulation of a large proportion of the total costs of the hospital.

I recognize that in dicta in *Holy Cross I,* this Court said:

> "Some expenses of a patient's hospital stay traditionally have been included in the bill submitted to the patient by a hospital. For that reason, these expenses would come within the term 'total costs of the hospital' as those words are commonly understood, even if there were to be an attempt on the part of any hospital to enter into an independent contract for those services to be supplied through such hospital to its patients. For instance, it is known that some hospitals today contract with independent catering firms to supply meal services to hospital patients. *We do not think for one instant that it would be possible to remove meal costs from 'total costs of the hospital' so that hospitals might bill patients separately for meals, based upon charges to them of the caterer, and thus to remove such costs from the control of the Commission."* [*Holy Cross I,* 283 Md. at 689, 393 A.2d at 187 (emphasis added).]

However, the majority's holding in *Holy Cross III* casts doubt upon the continued viability of this concept. As a

result of its holding here, the question whether the Commission has authority to regulate other hospital-based professionals remains open with its resolution dependent upon proof that in 1971 in the health care field the term "total costs of the hospital" was a term of art that included the costs of the services of other hospital-based professionals.

It is conceivable that in the future some other hospital-based professionals might seek to become deregulated by charging a fee-for-service and having the hospital bill, or by billing directly for these services.[29] There, as here, by some vagary, only one expert might happen to make the explicit, conclusionary statement that the term "total costs of the hospital" was a term of art that included costs of services of other hospital-based professionals in 1971 in the health care field. There, as here, ample evidence might be adduced to show a virtually universal practice in which hospitals billed for the services of such hospital-based professionals in 1971. There, as here, there might be ample evidence of a virtually uniformly accepted meaning of the term "total costs of the hospital" as including the costs of services of such hospital-based professionals. There, as here, there might be ample evidence to show that the well-understood meaning of the term was different from its common signification.

---

**29.** The testimony of at least two witnesses adduced by the Hospital supports the conclusion that the dicta in *Holy Cross I* is no longer viable and that other hospital-based professionals might seek deregulation. *See, e.g.,* the testimony of a private practitioner at Holy Cross Hospital, Dr. O'Neil, who stated as follows:

"Q. Do you consider the *dietary service* of the hospital *to be a hospital service*?
A. Yes, sir.
Q. Is the same true of the cost of that service?
A. *That would be a hospital cost.*
. . .
Q. Suppose that corporation, let's call it the Marriott Corporation. Suppose it decided to *bill patients independent of the hospital for the dietary supply,* would that also be part of the total cost of the hospital?
. . .
A. Even *that could not be called a hospital cost.* I don't see how that could be called a hospital cost." (Emphasis added.)

Nevertheless, under the principle established by the majority here, the term "total costs of the hospital" would not be held to be a term of art with respect to the services of such hospital-based professionals. The ultimate result of such a holding would be that the Commission would be deprived of the authority to regulate the costs of services of other hospital-based professionals. The practical effect of such a holding would be that the Commission would lose the authority to regulate most of the total costs of the hospital.

Similarly, the trial court's holding that the Commission lacks the authority to regulate the costs of services of hospital-based physicians who bill patients directly is contrary to the purpose of the Act. The trial court, in essence, develops a principle that hospital-based physicians may avoid regulation of the costs of their services by electing to bill patients directly. This principle, which makes the Commission's authority to regulate depend upon the method by which hospital-based professionals elect to bill, "would elevate mere form over substance," *Blue Cross of Md., Inc.,* 277 Md. at 106, 352 A.2d at 806, and could well result in the total deregulation of the costs of services of all hospital-based physicians. In addition, the application of this principle to other hospital-based professionals may well result in the deregulation of a large proportion of the total costs of the hospital if such professionals elect to bill directly.

On the basis of the record before me, I find no reason and do not choose to join either the majority or the trial court in the possible destruction of the Commission. For five consecutive years, that agency, by effective regulation, has kept Maryland's percentage increase in hospital costs lower than that of the rest of the nation [30] and, thus, has protected the citizens of Maryland by "assuring the reasonableness of rates set by hospitals." *Health Servs. Cost Review Comm'n v. Franklin Square Hosp.,* 280 Md. at 234-35, 372 A.2d at 1052.

In my view, the Health Services Cost Review Commission has the authority to regulate the costs of services of salaried

---

**30.** *The Evening Sun* (Baltimore), Feb. 5, 1981, § B (Metro), at 1.

or nonsalaried hospital-based physicians whether billed by the hospital or by the hospital-based physicians. Accordingly, I would reverse that portion of the trial court's 6 May 1980 judgment that prohibited the Commission from regulating the costs of services of Holy Cross Hospital's hospital-based physicians who billed patients directly, and affirm the trial court in all other respects.

Judge Eldridge authorizes me to state that he joins me in the views expressed herein.

## APPENDIX A

### Credentials of Commission's Witnesses
### Quoted in Dissenting Opinion
### (in alphabetical order)

MR. ROBERT A. DERZON — Senior Scholar, Institute of Medicine, National Academy of Sciences; former Administrator, Health Care Financing Administration, Department of HEW; Director of Hospitals and Clinics, University of California, San Francisco.

ROBERT HIGGINS EBERT, M.D. — President of the Milbank Memorial Fund; former Dean of the Harvard Medical School, and President of the Harvard Medical Center, a consortium composed of, among others, Massachusetts General Hospital, Peter Bent Brigham and Robert Bent Brigham Hospitals.

MR. ARTHUR E. HESS — Lawyer; retired Deputy Commissioner, Social Security Administration, Department of HEW; Director, Health Insurance (Medicare) Social Security Administration.

MR. A. RUTHERFORD HOLMES — Executive Director of the Hospital Cost Analysis Service, Inc., lawyer and certified public accountant.

MR. J. DONALD MORFE — Senior Director of Blue Cross of Maryland, Inc., and certified public accountant.

RUSSELL A. NELSON, M.D. — Director, President and then President Emeritus of Johns Hopkins Hospital; former President, American Hospital Association; Member, Joint Commission on Accreditation of Hospitals.

MR. JACK W. OWEN — Assistant Director, American Hospital Association; former President, New Jersey Hospital Association; Chairman and President, Health Care Insurance Exchange.

MILTON I. ROEMER, M.D. — Professor of Public Health, School of Public Health; and Professor of Preventive Medicine, Medical School, U.C.L.A.; former Director, Medical and Hospital Services, Saskatchewan Department of Public Health, Regina, Canada; Head, Division of Medical and Hospital Administration, U.C.L.A.

ALBERT W. SNOKE, M.D. — Consultant in Hospital and Health Administration and Lecturer of Hospital Administration, Yale University; Coordinator of Health Services at State of Illinois, and Acting Executive Director, Illinois Comprehensive State Health Planning Agency; former Executive Director, Yale-New Haven Hospital; President, American Hospital Association.

MR. FRANK VAN DYKE — Professor of Administrative Medicine at Columbia University School of Public Health and Administrative Medicine, and Director, MPH Health Administration Program; former Acting Head of the Division of Health Administration; Assistant to the President of the Associated Hospital Service of New York; and Member of the Hospital Review Committee, Health and Hospital Council of Southern New York.

## APPENDIX B

Credentials of Hospital's Witnesses
Quoted in Dissenting Opinion
(in alphabetical order)

JOSEPH MICHAEL O'NEIL, M.D. — Private practitioner in obstetrics and gynecology on the staff at Holy Cross Hospital; President and Secretary of Holy Cross Hospital.

RICHARD E. PALMER, M.D. — Pathologist practicing at Alexandria Hospital and Circle Terrace Hospital Laboratory; former President of the American Medical Association; and President of the International Academy of Pathology.

---

*On Motion By Blue Cross Of Maryland, Inc., For
Leave To File A Motion For Reconsideration
As Amicus Curiae*

*Smith, J.:*

Blue Cross of Maryland, Inc., has filed a motion for leave to file a motion for reconsideration as amicus curiae. In the appended motion for reconsideration it points to positions taken by the Health Services Cost Review Commission since the filing of our opinion in this case. For instance, in one matter the staff recommended to the Commission, purportedly based upon our opinion, that "the Commission remove all physician cost and only approve an emergency room rate for the hospital service," adding, "The hospital or the physician may separately bill whatever they want for the physician cost. Those costs and revenues should be treated as an auxiliary enterprise if the hospital bills." In another case, according to Blue Cross, the Commission staff recommendation "states flatly that the [Commission] lacks the power to regulate any radiology services however billed." In yet another instance Blue Cross says the staff recommendation "contends that physician's services are not hospital services." We are not advised as to the context in which that statement was made.

Blue Cross says:

> If *Holy Cross III* means that *all* physician services
> are not hospital costs and therefore not hospital
> services, Blue Cross subscribers may be left without
> coverage for such services under their Blue Cross
> contracts. If *Holy Cross III* means that the deter-
> mination of which physician services are hospital
> costs and therefore hospital services depends on the
> compensation arrangements, then there is a
> pressing need for an immediate judicial determina-
> tion of the exact [perimeters] of the *Holy Cross III*
> decision. Without such further definition or
> clarification, Blue Cross subscribers will not be able
> to ascertain if a substantial portion of their hospital
> bills will be covered. Blue Cross will be forced to
> make claims decisions without any real guidance as
> to its legal obligations or the legal rights of its
> subscribers. [(Emphasis added.)]

Blue Cross recognizes that "the issues raised by the *Holy
Cross III* decision could be resolved by the institution of new
litigation," but contends "such litigation would be extremely
costly and time consuming and would almost certainly
return to this Court as Holy Cross IV, V and/or VI," adding
that "such a course of action would leave the rights of Blue
Cross subscribers in limbo for several years and would result
in piecemeal legal determinations which would greatly
exacerbate the situation." It requests that we "reconsider
[our] decision . . . for the purpose of clarifying under what
circumstances if any, the services of physicians are hospital
costs and therefore subject to regulation by the [Commis-
sion]."

We point out that in *Holy Cross* I, *Holy Cross Hosp. v.
Health Services,* 283 Md. 677, 393 A.2d 181 (1978), we had
but a single issue before us. There was no room for
misunderstanding on that since the very first paragraph of
the opinion read:

We are here involved as a matter of statutory construction with the question of whether fees charged by physicians in certain medical specialties to hospital patients, which fees are placed on hospital accounts and billed by the hospitals in such amounts to the patients, constitute a part of "the total costs of the hospital" so as to be considered as "reasonably related to the total services offered by the hospital" and thus whether the Maryland Health Services Cost Review Commission (the Commission) is empowered to review and set charges by these physicians in the specialties of cardiology, pathology, and radiology. [*Id.* at 679.]

After discussion of the facts of that case and the statute we concluded, " '[T]otal costs of the hospital' means the Hospital's expenditures or outlays of money in connection with the operation of the Hospital." *Id.* at 689. We went on to add:

Some expenses of a patient's hospital stay traditionally have been included in the bill submitted to the patient by a hospital. For that reason, these expenses would come within the term "total costs of the hospital" as those words are commonly understood, even if there were to be an attempt on the part of any hospital to enter into an independent contract for those services to be supplied through such hospital to its patients. For instance, it is known that some hospitals today contract with independent catering firms to supply meal services to hospital patients. We do not think for one instant that it would be possible to remove meal costs from "total costs of the hospital" so that hospitals might bill patients separately for meals, based upon charges to them of the caterer, and thus to remove such costs from the control of the Commission. However, on the record before us we are unable to agree with the conclusion of the trial judge or the conclusion of the Commission that the fees charged by these pathologists, radiologists, and

cardiologists are a part of the "costs of the hospital," the term being used here in the sense of cost of operation of a hospital. On the other hand, we do not rule out the possibility that at the time of the enactment of this statute the words "total costs of the hospital" might have been a term "of art" in the health care field having a well understood meaning different from its common signification which would include the fees of the physicians here. [*Id.* at 689.]

We concluded that the cause of justice would best be served by a remand to the Circuit Court for Montgomery County under Maryland Rule 871 without affirmance or reversal for further proceedings in order that the Commission might "be afforded an opportunity to present evidence of such an understanding of the meaning of the term within the field of health care at the time this statute was enacted, if such testimony in fact [was] available." *Id.* at 689-90. The concluding sentence of the opinion said:

In order that there may be no misunderstanding, we point out that if the services here under consideration were not understood in the health care field as embraced within "total costs of the hospital" at the time of the enactment of this statute, the Commission has exceeded the power vested in it by the General Assembly. [*Id.* at 690.]

Thus, this present case, now dubbed *Holy Cross* III, arose in the context of that remand. Since the Commission failed to establish an understanding in the health care field of the term "total costs of the hospital" as "having a well understood meaning different from its common signification which would include the fees of the physicians here," we held that on the facts of this case the Commission had exceeded its powers. The opinion held no more, despite what the Commission may attempt to read into it.

Our jurisdiction, with certain narrow exceptions not here pertinent, is exclusively appellate. *Shell Oil Co. v.*

*Supervisor,* 276 Md. 36, 40-44, 343 A.2d 521 (1975). We decide cases upon the basis of the points or questions tried and decided below. Maryland Rule 885. This Court has said repeatedly that it does not sit to express opinions on abstract propositions. In other words, it does not give advisory opinions. *See, e.g., Attorney Gen. v. A. A. Co. School Bus,* 286 Md. 324, 327-28, 407 A.2d 749 (1979); *Bishop v. Governor,* 281 Md. 521, 524-25, 380 A.2d 220 (1977); *State v. Ficker,* 266 Md. 500, 506-07, 295 A.2d 231 (1972); *Potts v. Governor,* 255 Md. 445, 449, 258 A.2d 180 (1969); *Washburne v. Hoffman, Etc.,* 242 Md. 519, 219 A.2d 826 (1966); *Lloyd v. Supervisors of Elections,* 206 Md. 36, 111 A.2d 379 (1954); and *Hammond v. Lancaster,* 194 Md. 462, 471-72, 71 A.2d 474 (1950), citing A. DeTocqueville, *Democracy in America,* Part First, Chapter VI (1876), J. Bryce, *American Commonwealth,* 256-59 (3d ed. 1901), and *State v. Shields,* 49 Md. 301, 305 (1878).

We cannot prevent the Commission from construing *Holy Cross* III as in some manner deciding something other than the single issue which we plainly set forth as before us for decision any more than we can be responsible for the fact that at the trial on the remand in *Holy Cross* I it chose to ignore the plain language of the printed opinion in *Holy Cross* I.

*Motion denied.*

Judge Davidson dissents.